# Richmond

AETNA LIFE INSURANCE COMPANY v. MARGARET B. HALE.

March 7, 1966.

Record No. 6109.

Present, All the Justices.

*John B. Spiers, Jr.* (*Spiers & Spiers*, on brief), for the plaintiff in error.

*Stuart B. Campbell* (*Campbell & Campbell*, on brief), for the defendant in error.

GORDON, J., delivered the opinion of the court.

Margaret B. Hale brought this action to recover disability payments under an accident policy issued to her by Aetna Life Insurance Company. She now has a judgment, entered in the circuit court on a jury verdict, in the amount sued for. We must decide whether the evidence, viewed most favorably to her, supports the verdict and judgment.

The primary question presented is whether the plaintiff's disability is covered by the terms of the policy. So far as is here relevant, the policy insures the plaintiff "against loss resulting directly and independently of all other causes from bodily injuries . . . effected solely through accidental means", and provides for disability payments "if such injuries, directly and independently of all other causes, shall . . . disable the Insured . . ."

The plaintiff's first burden, then, was to prove that her bodily injuries were effected solely through accidental means. *Gen. Acc. Corp.* v. *Murray*, 120 Va. 115, 90 S. E. 620 (1916).

The plaintiff's disability began on Sunday, December 9, 1962. For many years before that date, she had been employed as a registered nurse and had been apparently in excellent health. Since 1959, when she was employed by C. Davis Moore, Jr., M.D., a general practitioner in Wytheville, she had "never [been] sick for any reason".

When the plaintiff left Dr. Moore's office after work on Saturday, December 8, 1962, he noticed nothing unusual about her condition. The plaintiff had no recollection of what happened during the ensuing period of approximately two weeks.

In the early morning of December 9, the plaintiff's son who lived with her, heard a crash. Upon investigation, he found his mother lying unconscious on the floor of the bathroom. She was lying on her right side, with her right arm behind her, her feet partly under the basin, and her head against the door jamb between the bathroom and the bedroom. The bathroom and bedroom lights were lit. A loose rug, several inches from his mother's feet, "was scuffed up"; and a metal trash basket, near her back, was bent. The son covered her with a blanket and called Dr. Moore.

When Dr. Moore arrived, he found the plaintiff still unconscious, "moaning and groaning". Upon examining her, he found her blood

pressure "markedly elevated". Her left pupil was dilated. Her left arm appeared "to be paralyzed, or what we called Flaccid", but her right arm appeared to be normal. Dr. Moore noticed that the plaintiff had a bruise at the base of her skull, but he could not recall, when he testified, "which side it was on". He described it as "sort of like a little bruise; it wasn't actively bleeding and there wasn't any blood squirting out of it or anything like that, it was just a little scrape."

Dr. Moore concluded that the plaintiff "had had some sort of what we call intercranial or brain damage, and there was some question about whether she had had a stroke . . . She had signs very definitely that something serious was the matter with her as far as her brain went." [1]

Shortly after Dr. Moore concluded his examination, the plaintiff had "a convulsion or fit". Then, "seeing how sick she was and not having the proper facilities in town", he sent her to St. Luke's Hospital in Bluefield, West Virginia.

The tentative diagnosis at that Hospital, as shown by its records, was "? Subarachnoid Hemorrhage" or "? Subdural Hematoma, due to Trauma". [2] According to the evidence, a subarachnoid hemorrhage is a discharge of blood in the arachnoid space, which is between the arachnoid and the next innermost membrane covering the brain; and a subdural hematoma, due to trauma is a localized collection of blood, formed at the point of impact, under the outermost membrane covering the brain, the dura.

On December 19, the plaintiff was moved to Bluefield Sanatorium, where a cerebral arteriogram was performed. [3] This test, a report of which was introduced in evidence while Dr. Moore was on the

(1) Dr. Moore determined by the "Babinski sign" that both sides of the plaintiff's brain were involved. Her reaction was abnormal when he scratched each of her feet, indicating that the damage was not confined to one side of the brain.

He did not say what he meant by "stroke" and the other doctor who testified did not use the term. "Stroke", which apparently is not strictly a medical term, has been defined as "Any sudden attack of a disease such as a stroke of paralysis or apoplexy". Malay, Medical Dictionary for Lawyers (3rd ed.) 649.

(2) These alternative diagnoses were the "Discharge Diagnoses" shown on the records of St. Luke's Hospital, signed by C. M. Scott, M.D., who was identified as the plaintiff's attending physician. He did not testify in this case.

(3) Dr. Moore explained that an arteriogram is a normal diagnostic procedure in a hospital, comprising the injection of dye into the blood vessels and the taking of x-rays to determine the location of damage to the vessels.

The records of Bluefield Sanatorium disclose that E. L. Gage, M.D., was the plaintiff's attending physician. The report of the arteriogram was signed by John A. Warden, M.D. Neither doctor testified in this case.

witness stand, disclosed an aneurysm on the plaintiff's left carotid artery. Dr. Moore explained that an aneurysm is a weak portion of a blood vessel, which causes a "ballooning effect". He stated that an aneurysm could rupture spontaneously, causing hemorrhage.

John D. Varner, M.D., a neurosurgeon, examined the plaintiff on February 20, 1964 at the request of Aetna. On the basis of his examination and the records of St. Luke's Hospital, which were available to him at that time, he concluded that an aneurysm on the plaintiff's left internal carotid artery "had ruptured and caused her to fall". This conclusion supported one of the tentative diagnoses made at St. Luke's Hospital, a subarachnoid hemorrhage. Later, Dr. Varner received the report of the arteriogram, which confirmed his diagnosis.[4]

Drs. Moore and Varner agreed that an aneurysm is a congenital weakness. Dr. Varner expressed the opinion that the plaintiff's aneurysm pre-existed her fall on December 9, 1962 and the hemorrhaging was not caused by her fall on that day, but "was a spontaneous thing". Dr. Moore agreed that the rupture of an aneurysm would cause a person to fall. When that happens, he could not "say which occurred first, the fall or the rupture".

Dr. Varner explained that a subdural hematoma, if present, would be disclosed by an arteriogram, and the plaintiff's arteriogram did not show a hematoma. Dr. Moore did not express the opinion that the plaintiff had suffered a subdural hematoma. He expressed only the opinion that her condition could have been caused by trauma: when asked ". . . could her condition have been caused by a fall with a resulting bruise such as you observed on the base of her skull?" he answered "I would think so, yes, sir".

We now turn to a consideration of the issue whether the plaintiff sustained the burden of proving that her injuries were effected solely through accidental means. In view of the jury verdict for the plaintiff, we must look to the evidence upon which she relies, rather than the evidence favorable to Aetna.

The plaintiff's witness, Dr. Moore, admitted that she had an

---

(4) The plaintiff argues that the jury was justified in rejecting Dr. Varner's diagnosis, particularly since he admitted he could not explain why the plaintiff's left arm was paralyzed as testified to by Dr. Moore and shown by hospital reports. (According to the uncontradicted evidence, brain or nerve damage on the left side of the head, which can be caused by hemorrhaging, should result in paralysis on the right side, rather than the left side, of the body.) But, as will be pointed out, the decision of this case turns upon the failure of the plaintiff to bear the burden of proof, whether or not Dr. Varner's evidence on behalf of Aetna is rejected.

aneurysm; in fact, the existence of the aneurysm is shown without contradiction by the evidence. He admitted, moreover, that a fall would be caused by a ruptured aneurysm; and where a fall was accompanied by a ruptured aneurysm, he could not say whether the rupture occurred before or after the fall. So, whether we accept Dr. Varner's opinion that the rupture preceded the fall, or Dr. Moore's statement that he could not say which happened first, the plaintiff failed to bear the burden of proving that her injuries were caused by accidental means. Dr. Moore's statement is fatal to the plaintiff's case, since it left the order of the events to speculation.[5]

The plaintiff cannot recover, then, if her injuries were caused by a ruptured aneurysm. Does her evidence show any other cause, accidental or otherwise?

Dr. Moore concluded, from his examination of the plaintiff on December 9, only that she had undetermined intercranial or brain damage, possibly caused by a stroke. He recognized, of course, that the damage could have been caused organically or by trauma. Understandably, he formed no opinion as to the cause, but sent the plaintiff to St. Luke's Hospital for diagnosis and treatment. The record does not indicate that Dr. Moore examined the plaintiff after she was admitted to the Hospital.

Dr. Moore observed one mark on the plaintiff's body during his examination on December 9, a bruise or "little scrape" at the base of her skull. His evidence furnishes no connecting link, however, between the bruise or scrape, apparently caused by the fall, and the plaintiff's injuries. When he testified, he could not even recall whether the bruise was on the right or left side. At most, Dr. Moore said that a blow, with such a resultant bruise or scrape, "could" have caused the plaintiff's condition. He ventured no opinion that the fall caused her injuries.

*Gen. Acc. Corp.* v. *Murray, supra,* involving an accident policy covering "bodily injuries effected directly and independently of all other causes through accident means", is directly in point. In the *Murray* case, "the crucial question of fact presented . . . was whether the infection of erysipelas, which resulted in the death of the assured,

(5) On the basis of a notation made December 16, 1962 on the Hospital records "Patient [plaintiff] had gotten along fairly well until today when she developed a complete third nerve paralysis", plaintiff's counsel argues that the rupture of the aneurysm, if it happened, occurred seven days after the plaintiff's admission to St. Luke's Hospital. However, the conclusion that the rupture happened on December 16 is not supported by any medical testimony and can be reached only by speculation.

entered his body through the sores incident to smallpox or was caused by an accidental rubbing of his foot by his shoes". (120 Va. at 125, 90 S.E. at 623) The medical evidence established that erysipelas results from an infection that enters the body through some break or abrasion of the skin. The assured had complained that his foot was "smarting" after wearing a relatively new pair of high top shoes, and the next evening a witness saw a "rubbed" place on the assured's ankle. This Court held that even if the evidence had established that a sore resulted from wearing the shoes, the "rubbed" place observed by the plaintiff's witness was not shown to be the opening through which the erysipelas germs had entered the assured's body. Because the assured's death was not shown to have been "effected . . . through accidental means", the judgment against the insurer was reversed.

In the present case, the evidence of the plaintiff's witness Dr. Moore does not show the fall caused damage to Mrs. Hale's head that brought about the condition from which she now suffers. His evidence is not sufficient to sustain the plaintiff's first burden, that of showing "accidental means" as the cause of her injuries.

The plaintiff apparently does not rely upon the tentative diagnoses made at St. Luke's Hospital to prove that her injuries were caused by accidental means. In any event, these diagnoses did not supply the necessary proof, since they indicated that the plaintiff's injuries might have been due to the fall (subdural hematoma, due to trauma) or might have been due to another cause (subarachnoid hemorrhage). Like Dr. Moore's testimony, they could show at best that accidental means were equally probable as non-accidental means. And the plaintiff cannot recover if it was equally probable that the damage was caused by non-accidental means as by accidental means. See *Gen. Acc. Corp.* v. *Murray, supra,* 120 Va. at 126, 90 S.E. at 624.

The evidence, viewed most favorably to the plaintiff, is insufficient to support the jury's finding that her injuries were effected through accidental means. This holding necessitates the setting aside of the judgment entered for her on the motion for judgment.

■ The only remaining question is whether Aetna should have judgment against the plaintiff on its counterclaim. Aetna asked judgment for $1,520 as reimbursement for sums voluntarily paid to the plaintiff under an alleged mutual mistake of fact. The voluntary payments included medical expenses of $500 and disability payments of $15 per week for the period beginning December 9, 1962 and ending March 28, 1964.

Aetna contends these payments were made on the basis of information furnished by the plaintiff's son on her behalf. This information was set forth on two forms delivered to Aetna, a completed proof of loss form and a completed hospital insurance form. Aetna says the statements on these completed forms led it to believe the plaintiff had suffered a fall that caused her disability. Further, Aetna contends it received no information indicating any other cause until receipt of Dr. Varner's report in March 1964, after which the voluntary payments were discontinued. (The plaintiff subsequently brought this action to recover disability payments for a period beginning March 28, 1964.)

In its argument Aetna overlooks certain information set forth on the completed forms. The proof of loss form contains this statement: "Fell and hit right side of skull behind the ear this resulted in *subarachnoid hemorrhage*, that resulted in partial paralysis and double vision". [Emphasis supplied] The following diagnoses, taken from the records of St. Luke's Hospital, were set forth on the hospital insurance form: "? Subarachnoid Hemorrhage. 2. ? Subdural Hematoma, due to Trauma". Obviously, the tentative diagnosis of a subarachnoid hemorrhage indicated that the cause of the plaintiff's injuries might have been non-traumatic or non-accidental. In fact, Aetna has consistently maintained in this case the position that the plaintiff's injuries were caused by a subarachnoid hemorrhage.

The jury was instructed that Aetna should prevail on its counterclaim if these voluntary payments "were made under a mistake of fact, under the reasonable belief that the loss resulted from an accident and [Aetna] later discovered that the loss was one for which the company was not liable under the terms of the policy". This instruction having been offered by Aetna and the jury having returned a verdict for the plaintiff, the principles set forth in the instruction became the law of the case.

By this instruction, issue was joined on the question whether the voluntary payments were made "under the reasonable belief that the loss resulted from an accident". In view of the information set forth on the proof of loss and hospital insurance forms received by Aetna, a jury question was presented whether Aetna was reasonable in its belief that the loss resulted from the accident. The verdict and judgment for the plaintiff on Aetna's counterclaim therefore should not be disturbed.

The judgment entered below on the motion for judgment will be

reversed and final judgment for Aetna Life Insurance Company thereon will be entered here, without disturbing the judgment for Margaret B. Hale on the counterclaim of Aetna Life Insurance Company.

*Reversed in part, affirmed in part, and final judgment.*