# Richmond

## Joe C. Wells v. H. B. Whitaker, Et Al.

November 28, 1966.

Record No. 6223.

Present, All the Justices.

*Carl E. McAfee* and *Glen M. Williams* (*Cline & McAfee*, on brief), for the plaintiff in error.

*Leslie M. Mullins* and *John H. Carroll* (*Greear, Bowen, Mullins, Winston, Pippin & Sturgill*, on brief), for the defendants in error.

I'ANSON, J., delivered the opinion of the court.

Plaintiff, Joe C. Wells, filed a motion for judgment against the defendants, H. B. Whitaker and H. W. Whitaker, individually and

t/a Whitaker-Atlas Supply Company; Atlas Powder Company (now Atlas Chemical Industries, Inc., hereinafter referred to as Atlas); Sol Miller; and Howard Adams, to recover for damages to his home resulting from an explosion occurring on December 27, 1961, at the Whitaker-Atlas plant, where ammonium nitrate was mixed with fuel oil to produce a blasting agent.

There was a jury trial, and at the conclusion of all the evidence the trial court sustained a motion to strike the evidence as to defendant H. B. Whitaker. The order dismissing H. B. Whitaker as a party defendant was entered on September 30, 1963. The court also ruled as a matter of law that neither an agency nor a joint venture relationship existed between Whitaker-Atlas and Atlas with respect to the mixing plant operation. The court further ruled that Whitaker-Atlas was an independent contractor of Atlas under two contracts between them, but that Whitaker-Atlas' status as an independent contractor would not insulate Atlas from vicarious liability for negligence in storing in the Whitaker-Atlas plant an explosive known as "primacord" due to its hazardous nature.

The jury returned verdicts for defendants Miller and Adams and for the plaintiff against H. W. Whitaker and Atlas in the sum of $5,000.

On April 6, 1965, the trial court set aside the jury verdict against Atlas and entered final judgment for it on the ground that although there was sufficient evidence for a jury to find Atlas negligent in storing primacord at the Whitaker-Atlas plant or permitting it to remain there during welding operations, the evidence was insufficient for the jury to find that the negligence of Atlas was a proximate cause of plaintiff's damages.

We granted plaintiff a writ of error as to defendants Atlas and H. B. Whitaker. H. W. Whitaker, Sol Miller and Howard Adams are not parties to this appeal.

Plaintiff assigns as error the action of the trial court (1) in setting aside the jury verdict against Atlas; (2) in holding that under the two contracts Whitaker-Atlas was an independent contractor of Atlas, and that with respect to the mixing plant operations no agency, joint venture or independent contractor relationship existed between Whitaker-Atlas and Atlas; and (3) in striking his evidence as to defendant H. B. Whitaker and not permitting him to amend his pleadings at the conclusion of all the evidence to allege that H. B.

Whitaker was the owner of the land on which the Whitaker-Atlas plant was constructed.

The evidence, stated in the light most favorable to plaintiff, shows that the Whitaker-Atlas Supply Company plant, located in Needmore, near Norton, Virginia, was constructed in early 1959. The company was engaged in the business of mixing ammonium nitrate with fuel oil at the Needmore plant, the end result of which was a blasting agent used extensively in strip mining operations.

H. W. Whitaker owned the building and the equipment therein and leased the land on which the plant was located from his father, H. B. Whitaker. Several months prior to the explosion H. W. Whitaker filed, in the proper clerk's office, a certificate under the assumed name statute (Code § 59-169) setting forth that he was the sole owner and operator of the business trading as Whitaker-Atlas Supply Company.

On December 27, 1961, Sol Miller and Howard Adams were hired by Whitaker-Atlas to perform certain welding operations on the equipment in the plant; and while they were so engaged, sparks from the welding torch fell into the bottom of the bucket elevator, four feet below the floor level, where diesel fuel oil had accumulated, and started a fire. Miller and Adams were unable to put out the fire with the fire extinguishers on hand; and when the town fire fighting equipment arrived, the fire was "a burning inferno." After the area was ordered evacuated by the chief of the Norton Fire Department, a violent explosion occurred which destroyed the plant and many buildings nearby and damaged plaintiff's home, located one-half mile from the plant and separated from it by a ridge 200 feet high.

On the day of the explosion 40,000 feet of primacord were stored in boxes on a loft or balcony in the mixing plant, which was approximately 50 by 40 feet in area. About fifty tons of ammonium nitrate were also in the building, some two-fifths of which had been mixed with fuel oil and stored in bags stacked on the wood floor under the loft or balcony.

The Whitaker-Atlas Supply Company was organized by H. W. Whitaker in October, 1958, to sell explosives and other supplies to miners. In the course of his business he entered into two contracts with Atlas Powder Company. Under the first contract (referred to as the magazine contract), dated November 15, 1958, Whitaker-Atlas sold explosives and blasting supplies manufactured by Atlas, including primacord (but not ammonium nitrate), consigned by Atlas

to its three magazines on the Guest River, several miles from Norton, Virginia. All sales by Whitaker-Atlas from the magazines were made in its own name, and there were no limitations on its extension of credit to its customers. The contract was terminable at the option of either party on thirty days' notice, and Whitaker-Atlas was not expressly prohibited from dealing in goods of other explosives manufacturers. The second agreement (referred to as the hauling contract), dated July 26, 1959, provided for Whitaker-Atlas to haul for Atlas inbound consigned materials delivered at Norton to the Atlas magazines and outbound materials from the magazines to Atlas customers.

Shortly after Whitaker-Atlas entered into the contract of November 15, 1958, Whitaker learned that mixed ammonium nitrate was less expensive than other explosives he was buying from Atlas under his contract, and he purchased the product from other suppliers. Then in early 1959 he decided to erect his own plant at Needmore to mix ammonium nitrate with fuel oil. Whitaker-Atlas purchased outright from Atlas the ammonium nitrate used at the mixing plant, and the purchases were billed and delivered directly to it.

Later, Whitaker-Atlas encountered financial difficulties, and on November 27, 1961, H. W. Whitaker executed a promissory note payable to Atlas, which was secured by a chattel mortgage and agreement to assign, on notice by Atlas, accounts receivable generated by the sale of Atlas products. After the explosion Atlas demanded payment of the note and assignment of accounts and hired a former employee of Whitaker-Atlas to assist in collecting the accounts.

An Atlas representative regularly made an inventory of the consigned materials at the Atlas magazines and on several occasions checked consigned materials, including primacord, that had been removed to the Whitaker-Atlas plant. The ammonium nitrate at the plant was not included in the inventory. The purpose of the inventory was to adjust the accounts between Atlas and Whitaker-Atlas, with Whitaker-Atlas being charged for items missing from the magazines at the time of the inventory. On the day of the explosion Mr. Carty, sales agent of Atlas, visited the plant for a few minutes and observed the welding operations.

Atlas representatives visited the mixing plant from time to time and made suggestions to the Whitaker-Atlas employees as to how they could more effectively carry on their work and care for the equipment of the plant.

Plaintiff's expert witness, Mr. Neal Hammon, testified that ammonium nitrate, before it is treated with oil, is an ordinary commercial fertilizer. It may be detonated either by heat or shock. Ammonium nitrate with oil is detonated by the same means as ammonium nitrate without oil, but less heat or shock is required when oil is added. The temperature at which fire alone will detonate ammonium nitrate depends on the critical mass, which is the total poundage present in a given area. He was unable to say what amount of ammonium nitrate would constitute a critical mass. In a standard test to determine sensitivity to detonation by shock, a four-pound weight dropped thirty-one inches will detonate ammonium nitrate, and as the temperature is increased a shorter drop is sufficient. Burning ammonium nitrate gives off a gas which can create sufficient pressure on the surface to produce the requisite shock for detonation.

Mr. Hammon said that primacord is an explosive which comes in rope-like form. He testified, "This isn't a fuse you see in television movies. It isn't something you attach to dynamite and light it. You can't light it. You can take a match and it will not light. It will burn a little or melt. I will put a match to it right now; it won't burn." He further said that although it is not supposed to explode in fire, he had heard of one case where that had happened; but he was not familiar with the facts and circumstances there. Primacord is more sensitive to shock than is ammonium nitrate, and a four-pound weight dropped eight inches will detonate it.

On direct examination, Mr. Hammon testified that an explosion at the plant of about fifty tons of ammonium nitrate, two-fifths of which was mixed with fuel oil, would have caused the damage to plaintiff's home. On the other hand, he said an explosion of only 40,000 feet of primacord might have caused some damage to plaintiff's home, such as a broken window. If both the ammonium nitrate and primacord in the specified amounts exploded, the primacord would be "a contributing, although a small contributing factor in the total concussion." He did not express an opinion that the detonation of the primacord caused the explosion. He said whichever explosive was detonated first would have set off the other, and the human ear could detect only one explosion.

Chief Earle Brown of the Norton Fire Department, who was the last person to leave the plant before the explosion, testified that the ammonium nitrate was on fire and generating terrific heat when he

departed. When he returned to the scene after the explosion, he did not see any primacord in the debris.

The first issue before us is whether the trial court erred in setting aside the verdict of the jury on the ground that plaintiff had not sustained the burden of showing by a preponderance of the evidence that Atlas' negligence was a proximate cause of the damage to his home. In view of the jury verdict for the plaintiff on the issue of causation, we must decide whether the evidence viewed most favorably to him supports the verdict against Atlas. *Aetna* v. *Hale*, 206 Va. 840, 843, 147 S. E. 2d 126, 129 (1966).

The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred. *Huffman* v. *Sorenson*, 194 Va. 932, 937, 76 S. E. 2d 183, 187 (1953). Proximate cause has been described as a shorthand descriptive phrase for the limits the law has placed upon an actor's responsibility for his conduct. Prosser, Torts 240 (3d ed. 1964). Note, *The Status of Proximate Cause in Virginia*, 41 Va. L. Rev. 991 (1955).

The element of proximate cause under consideration in the instant case is the initial one of causation in fact. To impose liability upon one person for damages incurred by another, it must be shown that the negligent conduct was a necessary physical antecedent of the damages. We have said, "Negligence and an accident, however, do not make a case. As between them there must be a causal connection. 'The evidence tending to show causal connection must be sufficient to take the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference, before a question of fact for submission to the jury has been made out.'" *Hawkins* v. *Beecham*, 168 Va. 553, 561, 191 S. E. 640, 643 (1937); *Wilkins* v. *Sibley*, 205 Va. 171, 174-175, 135 S. E. 2d 765, 767 (1964).

The requirement of factual causation is often described as the "but for" or *sine qua non* rule. Generally a person is not liable to another unless but for his negligent act the harm would not have occurred. *Etheridge* v. *Norfolk So. R. Co.*, 143 Va. 789, 800, 129 S. E. 680, 683 (1925); Prosser, *supra*, at 242; 1 Harper and James, Torts, § 20.2, p. 1110 (1956); Seavy, *Principles of Torts*, 56 Harv. L. Rev. 72, 89-90 (1942).[1]

---

(1) The "but for" test is a useful rule of exclusion in all but one situation: where two causes concur to bring about an event and either alone would have been sufficient to bring about an identical result. Prosser, *supra*, at 243; 1 Harper and James, *supra*.

Plaintiff advances the theory that the primacord exploded first, thereby detonating the ammonium nitrate. He argues that the primacord was more sensitive to detonation than was the ammonium nitrate, and it was detonated by the heat generated by the fire, or by shock from falling from the loft as a result of the fire, or by a combination of the heat and shock.

Applying the "but for" test to the present case, only if it could be shown that the primacord was detonated first and then set off the ammonium nitrate would Atlas' negligence in storing the primacord have been a cause in fact of the damage due to the explosion. If, on the other hand, the ammonium nitrate detonated the primacord, since plaintiff's evidence shows that the primacord would have made only a small contribution to the total concussion, then it could not be said that but for the negligence of Atlas with respect to the primacord plaintiff's home would not have been damaged.

The evidence shows that ammonium nitrate could be detonated by fire and heat alone; but primacord would not ignite, nor would it explode from fire alone. The ammonium nitrate was burning and generating terrific heat when the fire chief departed from the building. Thus the plaintiff is reduced to the argument that the loft collapsed in the fire, allowing the primacord to fall with sufficient shock to detonate before the already burning ammonium nitrate exploded. While it is possible that the events occurred in the order plaintiff suggests, under the evidence it is equally possible that the ammonium nitrate exploded before the primacord fell from the loft. Plaintiff has advanced arguments within the realm of possibilities, but the evidence does not support them. No witness at the scene could testify that the primacord exploded before the ammonium nitrate. Furthermore, plaintiff's expert witness did not express an opinion that the primacord was detonated first and caused the explosion of the ammonium nitrate. The fact that no primacord was found in the debris after the fire does not establish that the primacord set off the ammonium nitrate. Primacord explodes from shock, and the explosion of the ammonium nitrate was sufficient to explode the primacord.

Plaintiff, relying on *Schools* v. *Walker*, 187 Va. 619, 47 S. E. 2d 418 (1948), argues that even if he did not establish that Atlas' negligence with respect to the primacord was the proximate cause of his loss, Atlas should be liable for his entire loss because the negligence of Atlas concurred with the negligence of Whitaker-Atlas to produce a single indivisible result. In *Schools* we held that if the acts

of two persons combine to produce an injury which either alone would not have caused, and each is a proximate cause, then both persons are liable. In *Schools,* however, there would have been no damage had either defendant exercised due care, and that case did not eliminate the need of plaintiff in the present case to establish that but for the negligence of Atlas, the explosion would not have occurred.[2]

Plaintiff's evidence was not sufficient to show that Atlas' negligence in storing the primacord or permitting it to remain while the welding operations were in progress was a proximate cause of the damages. Thus we hold that the trial court correctly held that Atlas' negligence was not a proximate cause of plaintiff's damages.

Plaintiff advances a number of arguments under his second assignment of error. He first argues that the court erred in holding that Whitaker-Atlas was an independent contractor of Atlas under the magazine and hauling contracts. He says that the relationship under the contracts was one of agent or servant; that the relationship extended to the mixing plant operations; and therefore he did not have to show that Atlas' negligence in storing the primacord in the mixing plant was a proximate cause of plaintiff's damages.

We do not agree with plaintiff's contention that the court erred in holding that Whitaker-Atlas was an independent contractor of Atlas under the magazine and hauling contracts. The criterion for determining whether a relationship is one of principal-agent or master-servant, on the one hand, or independent contractor on the other, is control or right to control the methods or details of doing the work, not control of the results: *Texas Company* v. *Zeigler,* 177 Va. 557, 564, 569-570, 14 S. E. 2d 704, 706, 709 (1941); *Griffith* v. *Electrolux Corp.,* 176 Va. 378, 388, 11 S. E. 2d 644, 648 (1940).

Plaintiff relies on *Texas Company, supra,* in support of his contention that a master-servant relationship existed between Whitaker-Atlas and Atlas, and that Whitaker-Atlas was not an independent contractor of Atlas under the magazine and hauling contracts. The terms of the contract in the *Texas Company* case are clearly distinguishable from the contracts in the present case. There the company exercised control with respect to the methods and details of

---

(2) The case of several concurrent causes due to independent actions, neither of which alone is sufficient to produce the entire loss, is distinguished from one of concurrent causes, either of which alone would have caused the entire loss. *Carolina, C. & O. Ry.* v. *Hill,* 119 Va. 416, 419, 89 S. E. 902, 903 (1916).

the services to be performed. No such control existed under the terms of the contracts in the present case.

The present case is strikingly similar to *Griffith* v. *Electrolux Corp.*, *supra*, where we held that the corporation's salesman was an independent contractor, as no absolute power was given Electrolux to control how or where its salesman should travel, what means of transportation he would use, when he should work, or other details of his activity. The agreement between the salesman and the corporation was one for results and did not give Electrolux the power to control the method or manner of obtaining those results.

Under the magazine and hauling contracts Atlas did not have the right to control the manner in which Whitaker-Atlas sold consigned Atlas products. As in *Griffith*, the contracts were for results and did not give Atlas control of the methods of obtaining the results. Thus we hold that the trial court correctly ruled that Whitaker-Atlas was an independent contractor of Atlas under the magazine and hauling contracts and not its agent or servant.

In addition to plaintiff's argument based on the magazine and hauling contracts, he contends that the mixing plant operations indicate that Whitaker-Atlas was subject to the requisite control and supervision to make it an agent of Atlas. He relies on the following bits of testimony: that the ammonium nitrate shipped to Whitaker-Atlas came in bags marked "Atlas Powder Company"; that an Atlas representative regularly took inventory of the consigned products at the magazines and on several occasions at the mixing plant; and that an Atlas representative advised Whitaker-Atlas employees how to seal and stack bags containing mixed ammonium nitrate, what "prills" to use, how to prevent rust on the mixing hopper, and on one occasion how much ammonium nitrate to use in a strip mining operation.

None of the bits of testimony relied on either separately or collectively indicates that Atlas representatives had any control or the right to control the operation of the mixing plant. Hence no agency or servant relationship has been shown in the operation of the plant.

Next plaintiff argues that even if there was insufficient evidence of control by Atlas to establish a master-servant relationship between Atlas and Whitaker-Atlas under the magazine and hauling contracts and the operation of the mixing plant, there was evidence from which the jury could find that they were engaged in a joint venture in operating the plant.

Although there is no generally accepted definition of joint ven-

ture, it is said to exist "when two or more persons combine in a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control or management." 10 Mich. Jur., Joint Adventures, § 2, p. 695.[3] This definition finds support in *Smith, Adm'r v. Grenadier*, 203 Va. 740, 744, 127 S. E. 2d 107, 110 (1962); *Jackson Company v. City of Norfolk*, 197 Va. 62, 67, 87 S. E. 2d 781, 784 (1955); *Jones v. Galleher & Co., Inc.*, 187 Va. 602, 609, 47 S. E. 2d 333, 336 (1948).[4]

Joint ventures are not established by operation of law but by contracts, expressed or implied, between the parties. *Smith, Adm'r v. Grenadier, supra.* There is no evidence in the record to indicate any intention of the parties that Atlas was to exercise any voice in the control or management or to share in the profits or losses of the mixing plant's operation or that it did exercise control and share in the profits.

Profits accruing from the movement of ammonium nitrate from the manufacturer, Atlas, to the processor, Whitaker-Atlas, and then to the ultimate consumer cannot be said to be a sharing of the profits of the processor. The profit accruing must be joint and not several. Otherwise every person, firm or corporation who furnishes materials or supplies in connection with an enterprise might be termed joint venturers, whether or not they had any such intention. *Commercial Lumber Co. v. Nelson*, 181 Okla. 122, 124, 72 P. 2d 829, 830 (1937); 36 Va. L. Rev., *supra*, at 436. See also, Restatement (Second), Agency, § 14J (1958), for distinction between buyer and agent.

Furthermore, the assistance or advice which might have been rendered Whitaker-Atlas in such matters as using plastic coating on machinery to prevent rusting, stacking bags so they would not fall, and the amount of ammonium nitrate which might be needed for a particular project do not show that Atlas was a participant in or exercised any control over the operation of the mixing plant. Assistance to a prospective purchaser to the extent shown in this case

(3) Joint ventures are also described as joint adventures, joint undertakings, joint speculations and syndicate. However, it has been observed that "joint venture" or "joint adventure" is used in connection with a business relationship, while "joint enterprise" has been used for any community of interest as a result of which the negligence of one person may be imputed to another. 30 Am. Jur., Joint Adventures, § 2.

(4) See also an exhaustive article on the subject, Nichols, *Joint Ventures*, 36 Va. L. Rev. 425 (1950).

does not make Atlas a participant in the operations of Whitaker-Atlas. *Ford Motor Co.* v. *Switzer,* 140 Va. 383, 393, 125 S. E. 209, 211-212 (1924).

Plaintiff next argues that even if Whitaker-Atlas was not the servant of Atlas in the operation of the mixing plant, and even if they were not engaged in a joint venture, at the very least Whitaker-Atlas was an independent contractor of Atlas in connection with the operation. From this argument he seeks to show that Atlas is liable for failure to exercise due care to secure a competent contractor for the work. *Talley* v. *Drumheller,* 135 Va. 186, 191, 115 S. E. 517 (1923); 27 Am. Jur., Independent Contractor, § 28, p. 507. He also argues that Atlas is liable for damage caused by the failure of the independent contractor to exercise due care with respect to work which was inherently dangerous. *T. E. Ritter Corporation* v. *Rose,* 200 Va. 736, 742, 107 S. E. 2d 479, 483 (1959).

We need not consider the two theories asserted by plaintiff by which an employer may be held liable for damage done by an independent contractor. This court has described an independent contractor as "a person who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work according to his own ideas, or in accordance with plans furnished by the person for whom the work is to be done, to whom the owners look only for results." *Boyd* v. *Mahone,* 142 Va. 690, 696-697, 128 S. E. 259, 262 (1925). In the present case we cannot assume the existence of a contractual relationship with respect to the mixing plant, for that is the very point at issue. At this stage we are not concerned with whether Atlas controlled the details of operating the mixing plant, which would make Whitaker-Atlas a servant, or only the final result or product, which would make Whitaker-Atlas an independent contractor. The magazine contract was entered into six months before the mixing plant was even constructed, and the magazine and hauling contracts do not purport to apply to the mixing plant. There are no agreements in the record relating to the mixing plant. Thus it has not been shown that Whitaker-Atlas is "a person who is employed [by Atlas] to do a piece of work" with respect to the mixing plant. Whitaker-Atlas purchased the ammonium nitrate for its own use and not to achieve any result directed by Atlas.

Plaintiff's final assignment of error is that the trial court erred in striking the evidence as to defendant H. B. Whitaker on the

ground that he was not a joint venturer with H. W. Whitaker in the operation of the mixing plant, and in not permitting him to amend his pleadings to show that H. B. Whitaker was the owner of the land on which the mixing plant was constructed, in accordance with the evidence admitted without objection.

H. B. Whitaker contends that this appeal has not been properly perfected as to him. He argues that final judgment was entered for him on September 30, 1963; that notice of appeal and assignments of error were not filed to that judgment within sixty days, as required by Rule 5:1, § 4, Rules of Court; and that the writ of error granted in this case was to the final judgment entered on April 6, 1965.

The narrow issue presented is whether in an action at law an order dismissing the action against one defendant is subject to an appeal before the disposition of the case against the remaining defendants. A great number of cases hold that in the absence of a statutory provision to the contrary, a judgment is not final for purposes of appeal if it is rendered with regard to some but not all of the parties involved in the case. *Wells* v. *Jackson*, 17 Va. (3 Munf.) 458 (1814); 4 Am. Jur. 2d, Appeal and Error, § 54, p. 576. However, it has also been held that an adjudication final in its nature as to a collateral matter, separate and distinct from the general subject of the litigation and affecting only particular parties to the controversy, may be appealed prior to the determination of the case against all defendants. *Bowles* v. *Richmond*, 147 Va. 720, 129 S. E. 489, affirmed on rehearing, 147 Va. 729, 133 S. E. 593 (1926); 4 Am. Jur. 2d, *supra*.

In *Wells* v. *Jackson*, *supra*, this court held that where a case was dismissed as to all but one defendant, since the proceedings as to the remaining defendant might have an effect on the judgment from which an appeal was sought, the order of dismissal as to the other defendants was not final so as to be appealable before the entire case had been disposed of.

*Bowles* v. *Richmond*, *supra*, involved an action against the city of Richmond and a railroad company for negligently failing to safeguard an approach to the tracks. The trial court entered an order dismissing the case as to the city on its special plea that the plaintiff had failed to file a statement of details of the accident within a specified period as required by the city charter. On appeal, this court held that *Wells* v. *Jackson*, *supra*, did not apply because there was no joint interest between the defendants in the matters decided

by the lower court, and the order was appealable. 147 Va. at 725, 129 S. E. at 490.

In a comprehensive discussion of the distinction between severable and identical interests for purposes of determining the appealability of an order dismissing less than all of the defendants,[5] it was said in *Attorney General* v. *Pomeroy*, 93 Utah 426, 73 P. 2d 1277, 1294, 114 A. L. R. 726, 746 (1937):

> "[The] judgment is severable when the original determination of those issues by the trial court and reflected in the judgment or any determination which could be made as the result of an appeal cannot affect the determination of the remaining issues of the suit, *nor can the determination of such remaining issues affect the issues between plaintiff and the dismissed defendants if such defendants are restored to the case by a reversal.*" (Emphasis added.)

Should plaintiff secure a reversal on his theory that H. B. Whitaker was a joint venturer, then H. B. Whitaker might be charged with liability for the same acts or omissions which are the basis of H. W. Whitaker's liability. Thus we hold that the order of September 30, 1963, was not final for the purposes of appeal, and H. B. Whitaker is properly before us on this appeal.

Next we turn to the merits of plaintiff's contention that H. B. Whitaker was a joint venturer with H. W. Whitaker in the operation of the mixing plant. Plaintiff relies upon testimony that when H. W. Whitaker encountered financial difficulties, H. B. Whitaker, his father, co-signed some checks of Whitaker-Atlas and allowed some fuel oil used at the plant to be charged to his personal account. However, H. B. Whitaker maintained records of the amount owed to him by Whitaker-Atlas and accepted some ammonium nitrate from Whitaker-Atlas in partial payment. Several months before the explosion H. W. Whitaker filed in the proper clerk's office a certificate showing that he was the sole owner and operator of the mixing plant. There was no evidence showing that H. B. Whitaker shared in the control of the plant operations or in the profits and losses of the business. Since the assistance rendered by the father to his son was merely because of their family relationship and not because of a community of financial interest in the accomplishment

---

(5) Problem was eliminated by the 1961 amendment to the Federal Rule of Civil Procedure 54(b); Wright, Federal Courts, § 101, pp. 396-397 (1963). See also, *Developments in the Law—Multiparty Litigation*, 71 Harv. L. Rev. 874, 979 (1958).

of a common purpose, as shown by the evidence of this case, then the relationship is one of creditor-debtor and not joint venture. Cf., *Virginia Transit Company* v. *Simmons*, 198 Va. 122, 127, 92 S. E. 2d 291, 295 (1956).

Plaintiff says that the trial court should have permitted him, under Code § 8-217, to amend his pleadings to conform to proof as to H. B. Whitaker's ownership of the land on which the mixing plant was constructed to allege H. B. Whitaker's liability for permitting an ultrahazardous activity on his property, under the doctrine of *Rylands* v. *Fletcher*, L. R. 3, H. L. 330 (1868), affirming L. R. 1 Ex. 265 (1866).

It is unnecessary for us to determine whether the trial judge abused his discretion in not permitting plaintiff to amend his pleadings since H. B. Whitaker's mere ownership of the land does not support a cause of action against him under the facts and circumstances of this case.

Under the lease between H. B. Whitaker and H. W. Whitaker, H. B. Whitaker reserved no control or right to direct the operation of the plant. Ordinarily a landlord who retains no control over premises is not liable to an adjoining landowner for damage resulting solely from the negligence of the tenant. We have recognized, however, that under certain circumstances a landowner might be liable where a third person has been injured by a condition on the premises amounting to a nuisance. *Smith* v. *Wolsiefer*, 119 Va. 247, 254, 89 S. E. 115 (1916) (dictum); *Oliver* v. *Cashin*, 192 Va. 540, 546, 65 S. E. 2d 571, 574 (1951) (dictum). It has been said that a landlord may be responsible for damage from a nuisance created by his tenant where he leased the premises for a purpose which would amount to a nuisance per se to the neighboring property owners. 32 Am. Jur., Landlord and Tenant, § 765, p. 652. However, if the intended use of the leased premises may or may not become a nuisance, depending upon whether or not the tenant exercises due care, the landlord is not liable for the consequences of the tenant's negligence. *Langabaugh* v. *Anderson*, 68 Ohio St. 131, 148-149, 67 N. E. 286, 291 (1903). Thus the issue is whether the mixing plant constituted a nuisance for which the landlord is responsible where he has no control over the operations of the plant. Since we have already held that the storage of primacord was not a proximate cause of plaintiff's damage, at this point we are concerned solely with

whether the manufacture and storage of mixed ammonium nitrate amounted to a nuisance.

Plaintiff contends that the doctrine of *Rylands* v. *Fletcher, supra,* was in effect adopted by this court when we said that Virginia follows the general rule that it is not necessary to allege or prove negligence when the acts complained of result from a nuisance. *G. L. Webster Co., Inc.* v. *Steelman,* 172 Va. 342, 357, 1 S. E. 2d 305, 311 (1939). Professor Prosser pointed out that the *Rylands* v. *Fletcher* rule imposing liability without showing lack of due care for damage caused by an activity which is unduly dangerous and inappropriate to the place where it is maintained in the light of the character of that place and its surroundings has been applied in the United States under a variety of theories. Most frequently, Prosser said, strict liability has been imposed under the name of nuisance. Prosser, *supra,* 527. See also, Gregory, *Trespass to Negligence to Absolute Liability,* 37 Va. L. Rev. 359 (1951); Annot., 54 A. L. R. 2d 764 (1957).

In reliance upon *Steelman, supra,* we have held that blasting might constitute a nuisance. *Barnes* v. *Virginia Quarries, Inc.,* 204 Va. 414, 417, 132 S. E. 2d 395, 397 (1963). We have also said that the degree of care required of one who stores explosives is relative to the danger involved, and greater care is required in dealing with explosives than with harmless articles. *Daugherty* v. *Hippchen,* 175 Va. 62, 65, 7 S. E. 2d 119, 120 (1940). This court, however, has not held that the manufacture or storage of explosives is a nuisance per se. *Eaton* v. *Moore,* 111 Va. 400, 402, 69 S. E. 326, 327 (1910) (dynamite caps); *Smith* v. *United States,* 155 F. Supp. 605, 608 (E. D. Va. 1957). See also Annot., Absolute liability for damage or injury from explosion of stored explosive, 80 A. L. R. 692 (1932). The phrase nuisance per se in *Smith, supra,* was apparently used in the sense of liability for damage from an ultrahazardous activity without requiring a showing of negligence. Prosser, *supra,* 604.

Before it is mixed with fuel oil, ammonium nitrate is an ordinary commercial grade fertilizer. It is true that the end product of the mixing process is a blasting agent. However, it has not been shown that the mixed ammonium nitrate is an explosive of the kind which is ultrahazardous even when handled with the utmost care. The fact is that in this case H. W. Whitaker was negligent in permitting open flame welding in an area where fuel oil had accumulated below the floor level and had soaked into the floor. Furthermore, the danger from the mixed ammonium nitrate resulted from storing it in quanti-

ties which equalled or apparently exceeded the critical mass. Although H. B. Whitaker undoubtedly knew that mixed ammonium nitrate would be stored in the plant, there was no reason for him to contemplate at the time he leased the property that the ammonium nitrate would be negligently stored. *Langabaugh* v. *Anderson, supra*, 67 N. E. at 291. Hence we hold that under the circumstances of this case there is no liability on H. B. Whitaker for the damage which resulted from the negligence of his tenant.

For the reasons stated, the judgment is

*Affirmed.*