Thomas R. BUTTERWORTH, Jr., et al. Plaintiffs,

v.

INTEGRATED RESOURCES EQUITY CORP., et al. Defendants.

Civ. A. No. 87–0426.

United States District Court, E.D. Virginia, Richmond Division.

March 2, 1988.

Channing J. Martin, James J. Burns, Sarah Hopkins Finley, Williams, Mullen, Christian & Dobbins, Richmond, Va., for plaintiffs.

Andrew J. Ellis, Jr., Robert D. Seabolt, Mays & Valentine, Richmond, Va., Lionel E. Pashkoff, Lawrence Barcella, Laxalt, Washington, Perito and Dubuc, Washington, D.C., Thomas F. Eubank, Spinella, Owings & Shaia, P.C., Richmond, Va., for defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on Integrated's motion for summary judgment pursuant to Rule 56(b), Fed.R.Civ.P. Integrated argues that the plaintiffs lack standing to pursue a cause of action under § 10(b) of the Securities Exchange Act of 1934 on four grounds: (1) the "in connection with" language of § 10(b) requires the actual purchase or sale of securities; (2) there was no contract to buy securities because the plaintiffs did not know they were contracting to buy securities; (3) even if they did know, the contracts lacked specificity; (4) and even if the plaintiffs did have valid contracts, Baxter's misrepresentations did not go to the nature and characteristics of the securities themselves, as required by the statute.

Separate and apart from these arguments, Integrated asserts that the West End Orthopedic Clinic Pension and Profit Sharing Plan (WEOC), represented here by trustees Butterworth and Mauck, must be dismissed as a plaintiff because Baxter was acting as its agent at the time of the alleged conversion of funds.

### "In connection with" under § 10(b)

Integrated argues that the plaintiffs lack standing to sue under § 10(b) and Rule 10(b)–5 because no securities were actually purchased. It characterizes the plaintiffs' claims as sounding in conversion, not securities fraud. This argument relies heavily on a narrow interpretation of the language of § 10(b). The section provides in part:

It shall be unlawful for any person ... to use or employ, *in connection with* the *purchase or sale of any security* ... any manipulative or deceptive devise or contrivance in contravention of such rules and regulations as the Commission may prescribe.

15 U.S.C. § 78j(b) (emphasis added). "Purchase" is defined to "include any contract to buy, purchase or otherwise acquire." 15 U.S.C. § 78c(13). This provision suggests that one who contracts to buy securities is treated as a "purchaser" of securities, and

is therefore entitled to the protection afforded by § 10(b). *See also, Commerce Reporting Co. v. Puretec, Inc.*, 290 F.Supp. 715, 718 (S.D.N.Y.1968) ("The use of the words 'in connection with' indicates that Congress intended to protect against fraud in agreements to buy or sell, as well as with respect to completed sales, provided damages could be shown.") Those who enter into a contract to buy securities are entitled to the same protection as those who actually buy securities.

The district court in *Smith v. Chicago Corp.*, 566 F.Supp. 66 (N.D.Ill.1983) held, however, that § 10(b) should not be expansively read, and its remedies were available only to actual purchasers and sellers. The court dismissed the plaintiff's claims based upon facts nearly identical to the ones in the present case. In *Smith*, the defendant withdrew funds from the plaintiff's investment account and instead of investing the funds as directed, he converted them to his own use. The court based its holding on the Supreme Court's decisions in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) and *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

In *Blue Chip Stamps*, the Supreme Court denied relief under the Securities Exchange Act to three classes of potential plaintiffs: those who did not purchase securities because of an unduly gloomy representations; those who did not sell because of an unduly rosy representations; and those who suffered loss in their investment because of insiders' activities or corporate actions in violation of § 10(b). The *Smith* court inexplicably characterized the victims of a broker's conversion as investors in the first group—those who chose not to invest because of unduly gloomy representations. In making such a characterization, the *Smith* court misses a critical distinction between the three class of investors in *Blue Chip Stamps* and the plaintiffs in actions such as this. The three *Blue Chip Stamps* classes were passive actors. They took no actions which would serve to manifest their intention to purchase securities absent misrepresentations by the seller. Conversely, the plaintiffs here made *affirmative acts*. They wrote checks to Baxter, a clear manifestation of their intent to invest in securities.

The importance of this distinction is apparent when one examines the Supreme Court's concerns underlying their holding in *Blue Chip Stamps*. The Supreme Court noted two potential problems in securities litigation if the three classes of plaintiffs identified above were allowed standing. First, the Court feared vexatious litigation. Almost any individual would be able to state a claim and force the corporation to pay a settlement, go forward with a costly trial or cause delay in corporate activities. Second, the Court was concerned with problems of proof. The plaintiff's sole proof of fraud would be oral testimony about what he was told and his reasons for not investing.

These concerns are not warranted in the instant case. There is a tangible ticket to admission to the class of plaintiffs: a canceled check to Baxter. Although the plaintiffs' case relies on their testimony of what was said, their intent to enter into a contract for the purchase of securities is manifested by their canceled checks.

The decision in *Smith* also relies on the Supreme Court's holding in *Santa Fe Industries*. The concerns underlying the *Santa Fe Industries* opinion are inapplicable here as well. In that case, the Supreme Court noted that a private right of action under § 10(b) should be implied only in those instances that further the Act's primary purpose of full and fair disclosure of the nature of the security. The Court was reluctant to expand the parameter of § 10(b) to areas traditionally relegated to state law. *Santa Fe Industries*, 430 U.S. at 478, 97 S.Ct. at 1303. By allowing the plaintiff's claim to go forward, the Supreme Court would have disrupted Delaware's short-form merger statute and provided greater remedies to minority shareholders than those afforded under the state statute. Here, however, Virginia has not made an effort to limit the remedies available to individuals such as the plaintiffs.

Allowing a federal securities action in the context of the instant case will not disrupt any state law.

Therefore, to the extent that other cases cited by Integrated rely on *Smith*, those cases are distinguishable. *See John v. Blackstock*, 664 F.Supp. 1426 (M.D.Fla. 1987); *Baker v. Wheat First Securities*, 643 F.Supp. 1420 (S.D.W.Va.1986); *Bochicchio v. Smith Barney, Harris Upham & Co.*, 647 F.Supp. 1426 (S.D.N.Y.1986); *Crummere v. Smith Barney, Harris Upham & Co., Inc.*, 624 F.Supp. 751 (S.D.N.Y. 1985); *Bosio v. Norbay Securities, Inc.*, 599 F.Supp. 1563 (E.D.N.Y.1985).

### *Plaintiffs' contracts to purchase securities*

Integrated contends that even if § 10(b) grants standing to those who merely contract to purchase securities, the plaintiffs do not have standing here because they did not contract to buy securities. Integrated contends that they contracted with Baxter for investments, not securities. In support of these arguments, Integrated selectively quotes from the depositions of each of the plaintiffs to demonstrate that the plaintiffs did not know what they were buying through Baxter.

Since this matter is before the Court on a motion for summary judgment, the Court need only determine if the plaintiffs have presented sufficient evidence to allow the factual dispute to go to the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986).

■ There is no evidence in the Act that the purchaser must know and understand that the investment he is buying is a "security." It is sufficient that an investment be considered a security as a legal matter for the plaintiff to come within the protection of the Act. "[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). "Security" embodies a "flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

■ To fall within the protection of the Act, therefore, each plaintiff must have contracted to purchase securities. The Act does not require that the contract identify the security by name, but only that the terms of the contract be sufficiently specific to evidence a meeting of the minds by the parties. Each plaintiff's statement presents enough evidence to allow the question of whether there was a contract for the purchase of securities to be submitted to a jury.

Butterworth and Mauck, trustees for WEOC, gave Baxter checks for $150,000 and $60,000 in March 1985 to invest in "safe" stock options. In September 1985, they gave him checks for $200,000 and $50,000 to invest in high quality stocks. (Butterworth Aff. at 1–2; Pl. Ex. 2)

Chester Russell gave Baxter $100,000 to invest in an Integrated Cable Television limited partnership. (Dep. at 28–31, 75–77; Pl. Ex. 3) At the time Russell surrendered his check he formed a contract with Baxter for the purchase of securities. The fact that Baxter told him that he had missed the first offering and would place his funds in an high interest paying account is of no consequence.

Lynn Parsons agreed with Baxter to invest in Integrated's Harvest Fund, a limited partnership that invested in mortgages, and some securities. Baxter allegedly paid for the investment himself, and Parsons then wrote a check to Baxter. (Dep. at 46, 55; Pl. Ex. 6) The fact that the amount of the investment is reflected in dollars rather than number of shares is unimportant. The dollar amount is of sufficient specificity to grant the plaintiff standing.

Baxter discussed with Louis Stone the possibility of a $50,000 investment in securities, and Stone agreed. Baxter purportedly made the investment, and Stone paid him back. (Dep. at 35, 109; Ex. 8)

Mildred Tribble had dealt with Baxter since 1983. She had invested through Baxter with Integrated. Baxter sent her back her earnings plus her principal with a letter asking if she wanted to reinvest. She understood this to be an invitation to reinvest in the securities she had held. She returned the money—$20,000—to Baxter. (Dep. at 37; Ex. 9)

Baxter agreed to outline a stock portfolio for Elllen Wood. Wood agreed to buy the investments recommended by Baxter. In the meantime, Wood gave money to Baxter to be placed in a 60 day high interest bearing account. Again, at the time Wood entered into a contract with Baxter she thought she was buying securities. (Dep. at 103; Pl. Ex. 11; Baxter Ans. at 120)

Baxter also worked up a stock portfolio for Barbara Holt, and she invested some money in these securities through Integrated. She then gave Baxter an additional $20,000 with the intent that it be invested in the same securities, although they never discussed exactly what the $20,000 would be invested in. (Dep. at 40–41; Pl. Ex. 13)

Dennis Johnson agreed to give Baxter $90,000 to invest in the options market. Before doing so, Baxter tried to persuade him to invest in a cable television limited partnership. Baxter gave him an Integrated Annual report for him to read. Johnson turned over the $90,000 to be invested in a 6 month fund paying 15 to 20% interest. Although the evidence is unclear whether the funds were to be invested in a money market account, a "non-security," or an Integrated "security" product, the evidence does create a sufficient factual dispute for the jury's determination. (Dep. at 64; Pl. Ex. 15)

This evidence suggests that the plaintiffs each entered into a contract with Baxter for the purchase of a specific dollar amount of securities. Baxter failed to purchase the securities as promised. "[A] specific promise to perform a particular act while secretly intending not to perform the act may violate Section 10(b) where the promise is part of the consideration" for the purchase of securities. *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986). "Such a promise must encompass particularized actions and be more than a generalized promise to act as a faithful fiduciary." *Id.* Baxter did make promises of particularized actions and his misrepresentations went beyond promises to act as a faithful fiduciary.

### Causation

Nonetheless, to be actionable under § 10(b), the breach of the promise must cause the subsequent injury. *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). A plaintiff must show "both *loss causation*—that the misrepresentation or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiffs] to engage in the transaction in question. *Id.* at 313 (emphasis in the original) The plaintiffs' injuries flowed directly from Baxter's breach of his promise to invest their funds in the selected securities. The plaintiffs satisfy the second prong as well. Obviously if Baxter had not misrepresented that he was going to invest their money but told the plaintiffs he was going to steal it, they would not have invested.

Additionally, the cases relied on by the defendant are inapposite. In *Bochicchio v. Smith Barney, Harris Upham & Co.,* 647 F.Supp. 1426 (S.D.N.Y.1986), the broker's representations induced the plaintiffs to deposit funds in a Smith Barney house account, not a security, from which the broker later converted funds. The misrepresentations were not related to the purchase of securities, as is the case here, but only to opening investment accounts. 647 F.Supp. at 1430. The decision in *Crummere v. Smith Barney, Harris Upham & Co.,* 624 F.Supp. 751 (S.D.N.Y.1985) is based on a similar distinction.

In *Bosio v. Norbay Securities, Inc.,* 599 F.Supp. 1563 (E.D.N.Y.1985), the plaintiff instructed a broker to sell shares of a particular stock and to place the proceeds in the plaintiff's account. The shares were sold, but the proceeds were never deposited. The court denied a cause of action under the Securities Exchange Act because

the "misrepresentation" did not go "to any inducement by the defendants regarding the investment purposes of the sale, but to arrangements concerning the mechanics of the sale." *Id.* at 1566. The plaintiffs have submitted sufficient proof that Baxter's misrepresentations induced them to invest in securities and went beyond the mere mechanics of the sale.

The plaintiffs have standing to sue under § 10(b). They entered into contracts with Baxter for the purchase of securities, and therefore fall within the parameters of the "in connection" language of § 10(b). Their contracts are of the requisite particularity both as to subject matter and amount to withstand a motion for summary judgment. Finally, the plaintiffs' have presented sufficient evidence that their injuries were caused by Baxter's misrepresentations. Consequently, Integrated's motion for summary judgment on this basis is denied.

### *Agency*

In its motion for summary judgment, Integrated has also challenged the standing of the West End Orthopedic Clinic Pension and Profit Sharing Plan (WEOC), represented by trustees Butterworth and Mauck, to hold Integrated vicariously liable for Baxter's actions. Integrated contends that in the transactions that form the basis of this dispute, Baxter acted solely as WEOC's agent.

■ To hold Integrated vicariously liable for Baxter's actions, WEOC must prove by a preponderance of the evidence at trial that Baxter acted with Integrated's authority and within the scope of his employment. Here, however, as the nonmoving party in a motion for summary judgment, WEOC's burden is much less:

> [It is] entitled, as on a motion for directed verdict, to have the credibility of [its] evidence as forecast assumed, [its] version of all that is in dispute accepted, all internal conflicts in [the evidence] resolved favorably to [it], the most favorable of all possible inferences from [the evidence] drawn in [its] behalf; and finally to be given the benefit of all favorable

legal theories invoked by the evidence so considered.

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). *See also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The parties have characterized Baxter's relationship with WEOC and Integrated as that of a dual agent. They suggest that determining whether WEOC's and Integrated's interest as represented by Baxter are divergent or congruous is necessary to resolve this matter. It appears, however, that it would be more helpful to determine whose agent Baxter was acting as when WEOC entrusted $460,000 to him in March and September 1985.

■ In determining whether an agency relationship exists, the critical test is the nature and extent of control exercised by the purported principal over the agent. *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 492, 219 S.E.2d 874, 876 (1975). Although Virginia courts have essentially used "control" analysis to distinguish agency from other types of relationships, the analysis is appropriate here to determine whose agent was Roger Baxter when WEOC gave him checks for $150,000, $60,000, $200,000 and $50,000. *Id.* (distinguishing a franchise from an agency relationship); *Wells v. Whitaker*, 207 Va. 616, 151 S.E.2d 422 (1966) (distinguishing master-servant from independent contractor.) In assessing the amount of control the principal exercises over the agent, Virginia courts have looked at the extent to which the purported principal controls the methods and details of the agent's work. *Wells*, 151 S.E.2d at 429; *Griffith v. Electrolux Corp.*, 176 Va. 378, 388, 11 S.E.2d 644, 648 (1940). The question is not whether the party exercises control over the agent, but whether he has it. *Texas Co. v. Zeigler*, 177 Va. 557, 564, 14 S.E.2d 704, 706 (1941).

In support of its contention that Integrated exercised ultimate control over the methods and details of Baxter's investments, WEOC notes that Baxter was an Integrated representative when the funds were entrusted to him and that it believed Baxter was purchasing investments for the

pension plan through Integrated Resources. (Butterworth Aff. at 2; Pl. Ex. 2)

Integrated has presented evidence that WEOC exercised more control over Baxter than Butterworth's affidavit suggests. WEOC first dealings with Baxter appear to pre-date his association with Integrated Resources (Butterworth Aff. at 1), and the pension plan "hired" him about the time, or possibly shortly before, he became an Integrated representative. (Mauck Dep. at 42; Def. Ex. 45).

Second, WEOC obtained a commercial blanket bond indemnifying WEOC for loss of money or other property arising from the dishonest acts of its trustees, managers, officers or employees. Baxter's investment company, International Marketing and Investment, Inc., and later Baxter personally were covered by the bond. WEOC's bonding of Baxter suggests a closer, more entangled relationship than that of the usual client and broker.

Third, WEOC treated payments to Baxter in March and September 1985 differently than some other payments for investments with Integrated. The checks for the March and September investments were made personally payable to Baxter instead of payable to Integrated as were other checks. (Def. Ex. 13) The checks to Baxter were recorded either as "loans" (Def. Ex. A) or "options" while the checks made payable to Integrated were recorded as separate investments. (Def. Ex. B)

■ From these facts it is possible to infer that WEOC exercised considerable control over Baxter's investment activities. It treated him as an "employee" in some respects, entrusted funds to him personally, and in its financial records segregated funds entrusted to Baxter from those invested with Integrated. Nonetheless, the issue of Baxter's agency remains a factual dispute.[1] The inferences to be drawn from the evidence presented by Integrated may go far in rebutting WEOC's contention that Baxter was acting as an agent of Integrated, but it cannot be said that there are no longer any genuine issues of material fact in dispute. The matter cannot appropriately be resolved on a motion for summary judgment. Consequently, Integrated's motion for summary judgment is denied.

The plaintiffs have presented sufficient evidence to demonstrate that they have standing to sue under § 10(b) of the Securities Exchange Act. Furthermore, the jury will have to determine whether Roger Baxter was WEOC's agent when the plaintiff entrusted funds to him in March and September of 1985.

---

1. Under Virginia law where the issue of agency rests upon written documents, the issue is a question of law. "The construction of written documents is exclusively for the Court." *Fulton v. W.R. Grace & Co.,* 143 Va. 12, 22, 129 S.E. 374, 377 (1925), *cited in Murphy v. Holiday Inns,* *Inc.,* 216 Va. 490, 491, 219 S.E.2d 874, 875 (1975). In the instant case, the question of agency does not turn on the interpretation of written documents and should be resolved by the finder of fact.