COURT OF APPEALS OF VIRGINIA

Present:   Judges Russell,* Ortiz and Raphael
Argued at Richmond, Virginia

CATHERINE TYLER

v.      Record No. 0993-21-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE DANIEL E. ORTIZ
JULY 26, 2022

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Humes J. Franklin, Jr., Judge Designate

Bryan Jones (Bryan J. Jones, LLC, on brief), for appellant.

Sharon M. Carr, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Catherine Tyler pleaded guilty under Code § 18.2-111 to one count of embezzlement
after she stole nearly $650,000 from the law firm where she worked as a bookkeeper for
seventeen years.  At her sentencing hearing, the firm requested restitution in an amount $125,000
greater than the amount stolen for expenses related to Tyler's embezzlement.  Tyler objected.
The circuit court awarded the amount Tyler stole and the additional $125,000.  Tyler assigns
error to part of the circuit court's restitution award of the $125,000 because she argues that some
expenses awarded were not directly caused by her crime.  We agree with Tyler because some of
the expenses were too attenuated from her crime.  As a result, we reverse in part and affirm in
part.

---

* Justice Russell participated in the hearing and decision of this case prior to his investiture as a Justice of the Supreme Court of Virginia.

BACKGROUND

Tyler began working for the law firm Dygert, Wright, Hobbs & Hernandez, PLC in 2003 as a bookkeeper. The firm tasked Tyler with "managing the law firm's financial and accounting functions including its trust and operating accounts." Tyler's duties also included receiving and depositing money, "applying client payments to outstanding invoices, accounting for cost advances and reimbursement, and paying firm bills." She also later became the firm's real estate paralegal and was responsible for "preparing real estate transactions for closings, communicating with lenders and title insurance companies, making post-closing monetary disbursements, and performing account reconciliations."

Beginning sometime in or before 2012, Tyler started embezzling funds from the firm. The firm did not discover Tyler's embezzlement until January 2020, despite having independent professional obligations requiring it to manage and oversee its accounts and employees. By the time the firm had caught her, Tyler had drained most of the firm's accounts so that each account either had a negative balance or about $1,000 to $5,000 left. She also stole a $300,000 check intended for a real estate client (payoff check). The firm could not determine how much Tyler stole and realized it needed a forensic accountant. The firm then had to switch forensic accountants because of the complexity of the embezzlement. After the forensic accountant reviewed the firm's records, he determined the firm was missing $648,729.79. The accountant could track $560,000 of the missing amount through bank records, but the firm only had records dating back to 2012. The accountant determined that an additional $88,000 was also missing but could not "tie [it] to a specific transaction."

At Tyler's sentencing hearing, the firm requested as restitution the embezzled amount and certain expenses totaling about $125,000. These expenses included: (1) office expenses totaling $922.02, which included costs to order new checks for the new accounts the firm

opened, change the office locks, and pay an overdraft fee (office expenses); (2) malpractice and real estate insurance costs totaling $14,060.50, which related to a tail end coverage fee and one of the firm's insurers' legal fees after the insurer sued the firm (insurance costs); (3) legal fees totaling $14,622.50 arising from a lawsuit a client brought against the firm, the firm's lawsuit against Tyler, and other unspecified legal fees (legal fees); (4) forensic accounting costs totaling $34,493.75, including costs related to calculating the embezzled amount (forensic accounting fees); (5) the Virginia State Bar sanction fee and audit costs totaling $11,216.30, resulting from a VSB complaint which alleged the firm failed to maintain certain records, reconcile its accounts, and oversee nonlawyer employees (VSB fees); and (6) anticipated future costs totaling $29,075, which included costs for VSB-required audits every six months and for the forensic accountant's testimony (anticipated future costs). Tyler objected to each of these expenses except the forensic accountant's testimony costs.

The circuit court sentenced Tyler to twenty years in prison with eight years' active incarceration. It also ordered Tyler to pay $499,537.25 in restitution. That restitution amount included the $648,729 Tyler embezzled and the $125,808.25 in additional expenses minus $275,000 Tyler had paid back to the firm as part of the parties' civil settlement. Tyler moved to reconsider, but the circuit court denied the motion. Tyler appealed.

ANALYSIS

The circuit court abused its discretion by awarding certain costs, but not others, over the funds embezzled as restitution. Some costs awarded were too attenuated because the Commonwealth failed to prove the costs were directly related to Tyler's crime or the firm had independent duties related to account management and employee supervision.

## I. Standard of Review

We review a trial court's restitution award for abuse of discretion. *Slusser v. Commonwealth*, 74 Va. App. 761, 774 (2022). "On appeal, where the restitutionary amount is supported by a preponderance of the evidence and is 'reasonable in relation to the nature of the offense,' the determination of the trial court will not be reversed." *Burriesci v. Commonwealth*, 59 Va. App. 50, 55-56 (2011) (quoting *McCullough v. Commonwealth*, 38 Va. App. 811, 816-17 (2002) (noting the Commonwealth must prove the damage or loss "incurred . . . as a result of the offense . . . by a preponderance of the evidence")). Yet "[a circuit] court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (alterations in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

"In determining whether the trial court made an error of law, 'we review the trial court's statutory interpretations and legal conclusions *de novo*.'" *Rollins v. Commonwealth*, 37 Va. App. 73, 79 (2001) (quoting *Timbers v. Commonwealth*, 28 Va. App. 187, 193 (1998)). Further, we must look at whether a trial court's restitution award was guided by an erroneous conclusion that it could include indirect damages or losses in the award. *See Burriesci*, 59 Va. App. at 56-57 (noting that "in *Howell*, the trial court's restitution order . . . had been premised on an erroneous legal conclusion—that damages or losses to the victim that 'result only indirectly from the offense' may be included in an order of restitution" (citing *Howell v. Commonwealth*, 274 Va. 737, 739, 741 (2007))).

## II. Restitution Generally

"'Restitution' is . . . 'a restoration of something to its rightful owner: the making good of or giving an equivalent for some injury (as a loss of or damage to property).'" *Howell*, 274 Va.

at 740 (quoting *Restitution*, *Webster's Third New International Dictionary* (1993)). Courts often use restitution in a criminal context "to make the victim whole by compensating him for losses caused by the offense for which the defendant was convicted." *Fleisher v. Commonwealth*, 69 Va. App. 685, 691 (2019). A court may order a defendant to make restitution "for damages or loss caused by the offense for which conviction was had." Code § 19.2-305(B). Further, Code § 19.2-305.1(A) requires that a defendant receiving probation or a suspended sentence for a crime "which resulted in property damage or loss" make partial restitution for that property damage or loss.

This Court has interpreted the restitution code sections to confer wide latitude to trial courts using restitution as a remedial tool. *Ellis v. Commonwealth*, 68 Va. App. 706, 712 (2018). Still, the trial court's discretion is limited in two ways. First, restitution requirements "must be reasonable in relation to the nature of the offense, the background of the offender and the surrounding circumstances." *Deal v. Commonwealth*, 15 Va. App. 157, 161 (1992). Next, the ordered restitution must be for loss or damage *directly caused* by the defendant's offense. *See Howell*, 274 Va. at 741; *Ellis*, 68 Va. App. at 715.

The directly-caused-by constraint arises from Virginia courts' interpretation of Code § 19.2-305(B)'s "caused by" language. The Supreme Court of Virginia has read that language to prevent courts from imposing losses that are too attenuated from the offense. *Howell*, 274 Va. at 739, 741 (holding that the cost of a security system a victim installed after being burglarized was related to, but not caused by, the offense and was too attenuated from the offense); *Ellis*, 68 Va. App. at 715-16 (reversing an award of costs for all items burglarized even though the defendant was only convicted of receiving one of the stolen items because the offense for which the defendant was convicted did not directly cause the total amount lost). In adopting the attenuation language, the *Howell* Court relied on *State v. Chambers*, 138 P.3d 405, 414-15 (Kan.

Ct. App. 2006), and noted that the victim in *Chambers* installed the security system because of her concern that the defendant would reoffend. *Howell*, 274 Va. at 741.[1] We have interpreted *Howell* to bar recovery of costs incurred to prevent future criminal activity. *Salazar v. Commonwealth*, 66 Va. App. 569, 584 (2016).

Moreover, a loss or damage is not too remote if a defendant's offense is a "but for" cause of the harm. *Shelton v. Commonwealth*, 66 Va. App. 1, 8 (2016) (affirming an award for a police officer's medical expenses when he was injured while pursuing a defendant because the defendant's escape from custody was a "but for" cause of the officer's injuries). Costs are also directly related to a defendant's offense when the costs will restore a "pre-existing security system" rendered ineffective by the defendant's conduct. *Fleisher*, 69 Va. App. at 687-88, 690-91 (affirming the costs awarded for reprograming a victim's second car's computer and replacing its keys and locks when the defendant used the victim's first car without authorization, abandoned it unlocked, and then the keys to the second car, which were in the first car, went missing).

However, the "but for" language in *Shelton* creates a tension with *Howell's* attenuation principle[2] because "but for" causation arguably includes an infinite number of events stretching

---

[1] In *Chambers*, the court reversed a restitution award for a security system, calling it "tangential" to the offense. 138 P.3d at 415.

[2] Fundamentally, our disagreement with the concurrence boils down to how we read *Howell* and explains our disparate rationales. The concurrence reads *Howell* to implicitly adopt proximate cause. Our reading of *Howell* instead leads us to believe that the Supreme Court of Virginia recognized restitution awards needed a limiting principle to curtail a trial court's otherwise broad discretion to impose any number of costs related to the crime.

*Howell* notably excludes discussion of foreseeability and the idea that a defendant is still liable if she put into operation an intervening event. One could hardly argue that Howell could not reasonably foresee his victim increasing security or buying a security system after committing a crime against the victim. Nor could one contend that Howell did not put the victim's purchase of the security system into operation. In fact, under the concurrence's application of intentional torts to expand liability in restitution, the security system should be

- 6 -

back to the dawn of time. In fact, "'but for' causation-in-fact . . . might impose unlimited liability . . . for a large number of remote or insignificant causes in time and space." Peter Nash Swisher et al., *Virginia Practice Tort & Personal Injury Law* § 3:23 (July 2021 Update). To resolve this tension, we borrow aspects of proximate cause to inform a restitution award analysis.

Looking to proximate cause serves as a useful guidepost to limit "but for" causation and to determine whether a damage or loss is directly caused by the offense. "[P]roximate cause is 'an act or omission that, in natural and continuous sequence unbroken by a superseding cause, produces a particular event and without which that event would not have occurred.'" *Brown v. Commonwealth*, 278 Va. 523, 529 (2009) (quoting *Williams v. Joynes*, 278 Va. 57, 62 (2009)). A superseding or intervening cause is "an independent, intervening act that alone causes the victim's injury." *Id.* at 529-30 (holding that a defendant that led police on a high-speed chase proximately caused a victim's death because the police cruiser crashing into the victim's car did not supersede the defendant's reckless driving).

> "An intervening act which is reasonably foreseeable cannot be
> relied upon as breaking the chain of causal connection between an

---

included in the restitution costs. Thus, applying a proximate cause analysis to *Howell* results in an opposite decision to its holding.

Further, the Supreme Court of Virginia has shown its familiarity with tort law and proximate cause and has expressly incorporated proximate cause principles into an area of criminal law when it sees fit. *Robinson v. Commonwealth*, 274 Va. 45, 53 (2007) (interpreting the phrase "involved in an accident" to invoke a proximate cause analysis). Additionally, this Court has more often implemented a proximate cause analysis in criminal negligence cases or when the statute uses the term "proximate," both of which by their very nature include a proximate cause analysis. *Levenson v. Commonwealth*, 68 Va. App. 255, 259, 261 (2017); *Chapman v. Commonwealth*, 68 Va. App. 131, 140-41 (2017), *aff'd*, 296 Va. 386 (2018). Lastly, this Court has imposed the analysis when both Virginia legal commentary and the Supreme Court of Virginia previously applied proximate cause in a similar situation. *See Hawkins v. Commonwealth*, 64 Va. App. 650, 654-56 (2015) (applying a proximate cause analysis in an aggravated malicious wounding case that involved medical care after the crime which partially caused the impairment). Simply put, *Howell* does not go as far as the concurrence would like. Thus, the likelihood of an opposite result in *Howell* and the lack of proximate cause analysis in *Howell*, in part, explain why the majority has looked to proximate cause to inform its decision but has retreated from the wholesale adoption of tort law's proximate cause and intentional tort analysis.

original act of negligence and subsequent injury." Furthermore, an intervening event, even if a cause of the harm, does not operate to exempt a defendant from liability if the intervening event was put into operation by the defendant's negligent acts.

*O'Connell v. Commonwealth*, 48 Va. App. 719, 728 (2006) (citations omitted) (quoting

*Gallimore v. Commonwealth*, 246 Va. 441, 447 (1993)).

Notably, with proximate cause "[t]here is no yardstick by which every case may be measured and fitted into its proper place. In each case the problem [of proximate cause] is to be solved upon mixed considerations of logic, common sense, justice, policy and precedent." *Scott v. Simms*, 188 Va. 808, 816 (1949). Turning to proximate cause principles adds to a trial court's toolbox in reviewing restitution cases, but it does not control it.[3] Instead, it gives trial courts

---

[3] We reject the concurrence's larger adoption of tort law in restitution cases, specifically the expanded liability imposed on a defendant in the intentional torts' realm. While parallels have and can be drawn between tort and criminal law, these areas of law continue to remain distinct, guided by different histories, policy objectives, and values.

> Aside from the manifest procedural differences between criminal sentencing and civil tort lawsuits, restitution serves purposes that differ from (though they overlap with) the purposes of tort law. Legal fictions developed in the law of torts cannot be imported into criminal restitution and applied to their utmost limits without due consideration of these differences.

*Paroline v. United States*, 572 U.S. 434, 453-54, 456-58 (2014) (citation omitted) (limiting the application of certain causation tort principles in interpreting a restitution statute which required compensation for losses incurred "as the proximate result of the offenses" because the principles undermined congressional intent and were not demanded by the statute's text or legal tradition). The *Paroline* Court noted that it "is required to define a causal standard that effects the statute's purposes, not to apply tort-law concepts in a mechanical way in the criminal restitution context." *Id.* at 461. The United States Supreme Court concluded that

> courts can only do their best to apply the statute as written in a workable manner, faithful to the competing principles at stake: that victims should be compensated and that defendants should be held to account for the impact of their conduct on those victims, but also that defendants should be made liable for the

freedom to draw on experience, common sense, and other legal principles in deciding whether a loss or damage was directly caused by the defendant's offense. In light of proximate cause's fact-specific nature, we give deference to trial courts acting as fact finder unless they erroneously include in a restitution award damages indirectly caused by the offense.

### III. The Circuit Court's Restitution Award

Tyler generally contends that the circuit court abused its discretion in awarding restitution totaling $104,390.07 for the office expenses, insurance costs, legal fees, forensic accounting fees, VSB fees, and anticipated future costs because they were not directly related to Tyler's embezzlement. In light of the direct causal link between Tyler's embezzlement and many of the costs, the circuit court did not abuse its discretion in awarding costs for the office expenses, insurance costs, some legal fees, forensic accounting fees, and anticipated future costs for the forensic accountant's testimony.

But the circuit court abused its discretion by erroneously concluding that Tyler's embezzlement directly caused the damages relating to some legal fees, the VSB fees, and the anticipated future audit costs. The Commonwealth failed to prove by a preponderance of the

---

consequences and gravity of their own conduct, not the conduct of others.

*Id.* at 462.

Expanding restitution awards based on intentional tort principles results in applying "tort-law concepts in a mechanical way in the criminal restitution context" without giving due consideration to the differences in these areas of law. *See id.* at 454, 461. This is so because criminal law already accounts for intentional conduct. Intentional torts principles capture an element unaccounted-for in the negligence arena: a tortfeasor's intentional conduct. But intentionality is baked into criminal law. Many aspects of criminal law and its remedies exist specifically to address the defendant's intentional conduct. In fact, the defendant in *Howell* intentionally burglarized the victim, otherwise he could not have been convicted. The *Howell* Court thus recognized that restitution awards must be limited to damages caused by the offense, despite the intentionality of the defendant's conduct. Had the expanded scope of intentional tort law been applied to the *Howell* defendant, the Supreme Court of Virginia likely would have affirmed the award of the security system. In sum, the intentional tort principles suggested by the concurrence expand restitution in a way that *Howell* sought to limit.

evidence that several legal fees were directly caused by Tyler's embezzlement. Moreover, Tyler's conduct did not directly cause the VSB fees and anticipated future audit costs because the firm had an independent duty to monitor and reconcile its accounts and supervise Tyler which sufficiently attenuated the costs from Tyler's offense. In sum, this Court affirms the circuit court's restitution order in part and reverses in part.

## A. *Office Expenses*[4]

The $922.02 in office expenses are directly related to Tyler's embezzlement. Tyler's criminal conduct was the "but for" cause of the office expenses given that these costs would not have arisen otherwise and they returned the firm to its pre-crime status. If Tyler had not embezzled from and compromised the firm's bank accounts, the firm would not have had to change the account numbers and purchase new checks. While buying checks would otherwise be routine at a law firm, the firm purchased the checks only after it had to change the account numbers to protect the accounts due to Tyler's embezzlement. Further, if she had not stolen money from the firm and had returned the office key, the firm would not have had to change the office locks. Finally, Tyler's conduct directly caused the overdraft fee the firm paid because the firm would not have had to pay it but for Tyler moving money around during her embezzlement and draining the firm's accounts.

---

[4] Despite the Commonwealth's contentions, Tyler adequately preserved her objections to the restitution award of the firm's office expenses and anticipated future costs. At sentencing, her counsel generally objected to the $125,000 in restitution and objected to the "VSB bar fees," claiming "the bar issue is separate." He then stated, "We would object to the attorney's fees that . . . were part of the civil suit . . . . I would object to the insurance fees or other common business expenses, new checks, forensic accounting fees . . . ."

Given Tyler's general objection to the amount, the circuit court knew that Tyler was challenging most of the expenses listed in Exhibit 6. Tyler's counsel referenced the bar issue, which included the anticipated future costs of the audits the VSB imposed as part of the sanction. The common business expenses and new checks sufficiently encompassed office expenses like changing office locks and paying the overdraft fee. Thus, Tyler objected "with sufficient specificity" so that the circuit court could timely address the objection. *Scott v. Commonwealth*, 58 Va. App. 35, 44 (2011); Rule 5A:18.

Much like *Fleisher*, Tyler had compromised the firm's ability to protect its financial assets. Changing the account numbers, locks, and checks allowed the firm to "return[] . . . to the pre-crime status when [it] controlled access to [its assets]." *Fleisher*, 69 Va. App. at 691. The strictures in *Howell* which prevent a trial court from awarding expenses as restitution for measures taken solely to prevent future crime do not apply to these expenses. Though the expenses were "prompted by concern that [defendant] . . . would reoffend," *Howell*, 274 Va. at 741 (first alteration in original), *Fleisher* distinguishes between security upgrades, like installing a new security system, and restoration of security measures, like changing locks and car keys, *Fleisher*, 69 Va. App. at 690-91. As a result, the circuit court did not err in awarding the $922.02 in office expenses because Tyler's conduct directly caused the expenses and the firm incurred the expenses to restore it to its pre-crime status.

## B. *Insurance Costs*

The circuit court did not err in awarding the insurance costs as restitution. Of the total amount, $6,357 was for a tail end coverage fee the firm needed to obtain new insurance because its malpractice insurer refused to reinsure the firm when the firm could not pay its client the $300,000 payoff check that Tyler had embezzled. The remaining insurance cost is the legal fees the firm's real estate insurer charged it for the insurer's federal lawsuit against the firm after another client made a claim against the insurance bond. The insurer sued when it discovered that Tyler had likely embezzled an amount greater than the $200,000 bond the insurer issued to the firm. Under the agreement, the firm was required to provide $200,000 in collateral security upon the insurer's demand, but could not do so because Tyler drained the firm's accounts.

Both of these insurance costs are directly caused by Tyler's embezzlement. Tyler's conduct was the "but for" and proximate cause of these costs. Without Tyler's embezzlement, the clients would have received their money, the firm would not have had any claims against it,

and even if it had, it likely would have had sufficient assets to cover the collateral security required by the real estate insurer.  Moreover, the firm's malpractice insurer would have renewed the insurance contract, preventing the firm from paying the tail end coverage costs to obtain new insurance.  Further, Tyler's criminal conduct proximately caused the insurance costs because the firm's failure to oversee its accounts and Tyler could not independently cause the harm it suffered and did not act as an intervening cause between Tyler's acts and the harm.  Overall, "but for" Tyler's embezzlement, the firm would not have incurred the insurance costs, and the firm did not independently cause this harm.  Therefore, the insurance costs are directly related to the offense, and we affirm the circuit court's $14,060.50 award for these costs.

## C.  *Legal Fees*

The circuit court abused its discretion in awarding some of the legal fees.  Initially, the legal fees must be divided into several categories.  The first legal fees are for the suit by the client to whom the firm owed $300,000 (client suit).  Next are the fees from the firm's civil suit against Tyler which includes both the fees explicitly referencing the suit and the fees labeled "Atty's fees" (Tyler suit).[5]  Additionally, the firm listed several legal fees without explaining what the case was about or identifying which case the fee referenced.  These included fees marked Markel case (Markel case fees), others labeled embezzlement expenses (embezzlement expenses), and lastly others marked legal services fees (legal services fees).  One of the firm's

_____

[5] The "Atty's fees" have been included because the fees were paid to the same law firm that handled the law firm's Tyler suit.

partners, Leah Hernandez, briefly explained the client and Tyler suits but not the Markel case fees, embezzlement expenses, or legal services fees.[6]

As to the client and Tyler suits, "but for" Tyler's criminal conduct, the suits would not have happened. Indeed, Tyler told the firm that she had the $300,000 payoff check, the very basis of the client suit, in her purse. Had she not stolen the check, the client would have received the payoff check and would not have sued. Additionally, the firm would not have had to sue Tyler if she had not embezzled hundreds of thousands of dollars from it. As discussed above, the firm's failure to oversee Tyler and its bank accounts was not an intervening event because its failure alone could not have caused the need to defend against a client suit and to sue Tyler. Thus, the Tyler and client suits' legal fees are directly related to Tyler's embezzlement.

Yet the Commonwealth did not prove by a preponderance of the evidence the connection between Tyler's embezzlement and the Markel case fees, embezzlement expenses, and legal services fees. Instead, the only discussion of the legal fees lumps all the amounts together without demonstrating how each of the fees was related. Markel is the firm's former insurer, but the record does not reveal any information about how the Markel case fees related to Tyler's embezzlement. Additionally, the record fails to show how the firm incurred the embezzlement expenses and legal services fees as a result of the offense.[7] Thus, the Commonwealth failed to

---

[6] The only discussion of the legal fees was Hernandez stating

> The next, our legal fees. We incurred legal fees due to the suit against us by the [client] for the three hundred thousand (300,000) that we did not have within our account. We also incurred attorney fees with a civil suit against Ms. Tyler, in order to attempt to get some type of restitution money before being here before this court, and so that is the next section right there that says legal fees.

[7] Though the firm incurred the legal services fees at the same law firm as the fees it paid in the Markel case and the client suit, no evidence explains to which case the legal services fees related.

prove by the preponderance of the evidence that Tyler's conduct directly caused these legal fees. As a result, the circuit court erred in awarding these legal fees. In short, we affirm $4,255 in legal fees from the client and Tyler suits and reverse the restitution award as to the $10,367.50 for the other legal fees.

### D. *Forensic Accounting Fees*

Further, the forensic accounting fees are directly caused by Tyler's embezzlement. The different forensic accounting fees consist of the costs of hiring two accounting firms once the firm discovered Tyler's embezzlement. The firm had to hire a second accounting firm after the first accounting firm realized it lacked the resources to untangle the embezzlement's complexity. The firm only needed forensic accounting because Tyler embezzled money from it. In fact, Tyler's embezzlement forced the firm to conduct forensic accounting to establish how much Tyler had taken from specific clients and accounts so it could eventually reconcile its client ledgers and accounts. Moreover, persuasive caselaw has noted that amounts "paid for attorneys and accountants" to uncover the embezzlement's extent "would be considered a loss caused by . . . embezzlement." *Boley v. Commonwealth*, No. 0033-12-2, slip op. at 4 n.2 (Va. Ct. App. Apr. 16, 2013). Again, the firm's failure to oversee its accounts and Tyler's actions could not have been an intervening event because its failure alone could not have caused it to need forensic accounting. Therefore, Tyler's criminal conduct was both the "but for" and proximate cause of the forensic accounting fees.

Although Tyler's embezzlement directly caused the need for the forensic accounting fees, we address a limitation imposed in a Fourth Circuit case the *Howell* Court relied on to limit restitution awards. *See Howell*, 274 Va. at 741 (citing *United States v. Vaughn*, 636 F.2d 921, 923-24 (4th Cir. 1980)). In *Vaughn*, 636 F.2d at 925, the Fourth Circuit held that the trial court could not award as a condition of probation the IRS's costs for investigating the defendant's tax

evasion. It reasoned that "[t]he costs of investigation result only indirectly from the offense of income tax violation." *Id.* at 923. It also noted that the investigation "was a step removed from the defendant's misconduct" because the investigation "was not the event causing the government's initial loss of tax revenues." *Id.* The Fourth Circuit concluded that "[t]he costs to the government in performing its function of investigation and prosecution, however, would seem too remote from the offense itself to be recoverable as a condition of probation." *Id.*

*Vaughn* does not control this case's outcome for two reasons. Mainly, the firm would have had to conduct forensic accounting even if criminal charges were never brought to ensure that it could identify the magnitude of Tyler's embezzlement and the clients the crime affected. The firm could not have continued as a functioning business without unraveling the extent of Tyler's crime. In fact, the embezzlement required the firm to hire a forensic accountant because Tyler had so convoluted its records that it could not comply with IRS requirements until it fixed its books. In contrast, the IRS's investigation in *Vaughn* was not so essential to the IRS's business that it could not carry on without the investigation. *Id.* *Vaughn* is also distinct because the government, in this case the IRS, was both the victim and the investigative and prosecutorial mechanism. *Id.* at 924-25. Allowing the government to charge for its own investigations misaligns its incentives for investigating criminal conduct.

In sum, because Tyler's embezzlement directly caused the firm to incur costs for forensic accounting and *Vaughn* does not control this case's outcome, we affirm the circuit court's award of $34,493.75 for the forensic accounting fees.

### E. *VSB Fees*

As to the VSB fees, Tyler's crime was not the "but for" cause of the fees because the firm had independent duties to maintain and reconcile various financial records and supervise nonlawyer employees. The VSB fees include monetary sanctions imposed directly against one

of the firm's partners, which the firm helped pay, and the cost of one audit which the VSB required as a sanction. The VSB agreed disposition details the nature of the firm's misconduct which included violating the Virginia Rules of Professional Conduct Rule 1.15 Safekeeping Property and Rule 5.3 Responsibilities Regarding Nonlawyer Assistants. Rule 1.15 requires the firm to maintain certain records, properly manage client funds and property, and comply with certain accounting procedures. Moreover, Rule 1.15 requires firms to reconcile their client ledgers, cash receipts journal, and trust account balances and have a lawyer approve those records on either a monthly or quarterly basis.[8] Rule 5.3 requires managerial partners to ensure that a nonlawyer employee's behavior is "compatible with the professional obligations of the lawyer." Rule 5.3 also states that a lawyer is responsible for its employee's conduct if the lawyer had managerial or supervisory authority "and should have known of the conduct at a time when its consequences c[ould] be avoided or mitigated but fail[ed] to take reasonable remedial action."

In outlining the firm's misconduct, the VSB decision focused on the firm's failure to "perform the accountings, audits, reconciliations, or other responsibilities of client trust accounts," keep proper records, oversee or reconcile accounts, and supervise Tyler, its nonlawyer employee. According to the Rules of Professional Conduct, both Rules 1.15 and 5.3 are mandatory and "define proper conduct for purposes of professional discipline." Va. Rules of Pro. Conduct, Scope.[9] As a result, the firm was independently required to maintain certain records, reconcile its client accounts, and supervise nonlawyer employees, regardless of whether Tyler was embezzling funds. Further, Rule 5.3 states that "a lawyer shall be responsible for" an

---

[8] The VSB decision references the three versions of Rule 1.15 in effect during Tyler's embezzlement which included different timing requirements.

[9] Both rules use the term shall, which the Virginia Professional Rules of Conduct has described as an imperative. Va. Rules of Pro. Conduct, Scope.

employee's conduct that violates the Rules of Professional Conduct if the attorney knew or should have known about the conduct and could have prevented or mitigated the consequences.

Before Tyler even worked at the firm, the firm had a duty to comply with Rules 1.15 and 5.3, which was ongoing and, in this case, continuously unmet.[10] Because Tyler's crime occurred during the firm's misconduct in failing to comply with the Rules of Professional Conduct, the embezzlement could not be the "but for" cause of this harm. Instead, it was the firm's failed compliance that led to the VSB fees. Tyler's embezzlement was merely the "but for" cause of the revelation of the misconduct in which the firm was already engaging.

Hernandez admitted that nobody at the firm reviewed the firm's bills or bank statements, which resulted in the firm failing to identify Tyler's embezzlement for over eight years. Unlike the other expenses, the VSB fees were directly caused by the firm failing to comport with the Rules of Professional Conduct. The Rules created independent obligations for the firm. Thus, the firm engaged in misconduct by violating its own mandatory professional ethics rules for many years. As a result, the firm's acts or failures to act alone would have subjected it to sanctions without Tyler's crime, even though the VSB would have had much more difficulty detecting the firm's misconduct.

Because the firm could have been sanctioned regardless of Tyler's embezzlement, her crime was not a "but for" cause of the VSB fees. Therefore, we reverse the circuit court's award of the $11,216.30 in VSB fees as restitution.

### F. *Anticipated Future Costs*

Lastly, the circuit court properly awarded one of the anticipated future costs but should have excluded the other. The anticipated future costs consist of the audits the VSB required the

---

[10] Both rules were adopted in 2000. Tyler began working at the firm in 2003. Va. Rules of Pro. Conduct Rules 1.15, 5.3.

- 17 -

firm to conduct every six months for two years and the forensic accountant's testimony fee. The VSB imposed the audits as a sanction for the firm's misconduct. As discussed in the VSB fees section, the firm could have incurred the anticipated future audit costs sans Tyler's involvement because of its independent acts of failing to perform certain accountings, reconcile various accounts, and supervise nonlawyer employees. Consequently, Tyler's embezzlement was not the "but for" cause of the audit expenses. Therefore, the circuit court should have excluded this amount from the restitution award.

But the forensic accountant's testimony fee is directly related to Tyler's embezzlement because his testimony would have been unnecessary if she had not embezzled from the firm. Further, the firm's failure to oversee Tyler and the accounts was not an intervening event to break the causal chain between Tyler's conduct and the testimony fee. Thus, the circuit court properly awarded the accountant's testimony fee as restitution. As a result, this Court reverses the trial court's restitution award for the audit costs totaling $28,000 but affirms the testimony fee of $1,075.

Overall, many of the costs were directly related to Tyler's embezzlement. Yet, the unrelated legal fees, the VSB fees, and the anticipated future audit costs were not directly related to Tyler's embezzlement. In all, these expenses should not have been included in the restitution award because the Commonwealth failed to prove the connection to Tyler's crime or the firm had an independent duty to act.

CONCLUSION

Ultimately, because some costs are directly caused by Tyler's embezzlement, this Court affirms $76,224.45 of the restitution award for the office expenses, insurance costs, the client and Tyler suits' legal fees, forensic accounting fees, the future anticipated costs for the forensic accountant's testimony, and other costs not challenged by Tyler. Yet we reverse the award as to

$49,583.80 for the Markel case fees, embezzlement expenses, and legal services fees, the VSB fees, and the anticipated future audit costs. We remand this case to the circuit court solely to correct the figures in the restitution and sentencing orders.

*Affirmed in part, reversed in part, and remanded.*

Raphael, J., concurring in the judgment.

I concur in the judgment with regard to the disposition of the various elements of restitution at issue on this appeal. I write separately because I disagree with the majority that the contours of the proximate-cause doctrine are narrower for criminal restitution than in tort law. And just as the scope of liability is broader for intentional torts than for torts based on negligence, the scope of a defendant's potential liability in restitution should be broader for crimes that involve intentional wrongdoing, like the crime of embezzlement here. Although I agree with the majority that the trial court erred in awarding restitution for the law firm's costs of defending the VSB proceeding and for two years of auditing costs, I disagree with the majority's rationale. Tyler's embezzlement was the but-for cause of those damages. But it was not the legal cause. Because the law firm's violation of the Virginia Rules of Professional Conduct was the legal cause of that injury, the *ex turpi causa* doctrine precludes restitution for those costs.

## I.

At the outset, it bears repeating that a trial court's power to impose a full restitution award does not mean that full restitution is required in every case. As this Court recently explained, it is the rare criminal offense in Virginia that mandates restitution for "the full amount of damages." *Slusser v. Commonwealth*, 74 Va. App. 761, 771 (2022) (quoting Code § 19.2-305.1(B2)). In most cases in which restitution is ordered as a condition of a suspended sentence, only "partial" restitution is required. *Id.* (citing Code §§ 19.2-303, 19.2-305(B), 19.2-305.1(A), (B)).

As the Court made clear in *Slusser*, restitution serves overlapping but different purposes from tort law. *Id.* Similar to tort law, those purposes can include compensation to the victim and deterrence. *Id.* at 770-71. Thus, when determining restitution, a trial court may award full restitution to "help make the victim of a crime whole." *Id.* at 770 (quoting *McCullough v.*

- 20 -

*Commonwealth*, 38 Va. App. 811, 815 (2002)). But restitution may also serve the purpose of rehabilitation. *Id.* at 770-71. And a trial court may properly determine that the goal of rehabilitation would be disserved by imposing a restitution award so large that the defendant could never repay it. *See, e.g.*, *Rapozo v. State*, 497 P.3d 81, 96 (Haw. 2021) ("[A] restitution order patently beyond an offender's capacity for compliance serves no purpose, reparative or otherwise."); *People v. Kay*, 111 Cal. Rptr. 894, 896 (Cal. Ct. App. 1973) ("[T]o subject a defendant to a judgment which he cannot pay and has no reasonable prospect of paying . . . is of little use to the victim of the crime, and is apt to be either frustrating to a repentant probationer or perversely satisfying to a rebellious one.").

In this case, however, the trial court found it appropriate to impose a full restitution award that would compensate the law firm for the injury that it suffered due to Tyler's embezzlement. The trial court said this was "without question the most egregious embezzlement case" it had ever seen. The court's determination to award full restitution was a proper exercise of its sentencing discretion. The role of this Court on appeal is limited to determining whether the trial court abused its discretion by awarding elements of restitution for which Tyler is not legally responsible. "It is immaterial that other judges 'might have reached a different conclusion than the one under review.'" *Slusser*, 74 Va. App. at 774 (quoting *Fleisher v. Commonwealth*, 69 Va. App. 685, 689 (2019). "When imposing sentence, the [trial] court 'has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* (quoting *Fleisher*, 69 Va. App. at 691).

## II.

The starting point for this Court's analysis should be the causation requirement in the restitution provisions of the Code. Restitution may be awarded only for the "damages or loss caused by the offense." Code § 19.2-303; *see also* Code §§ 19.2-305(B) (same), 19.2-305.1(B)

("damage or loss caused by the crime").  Our Supreme Court has held that this causation requirement limits restitution to those damages or losses that were "directly caused by the offense."  *Howell v. Commonwealth*, 274 Va. 737, 741 (2007) (quoting *United States v. McMichael*, 699 F.2d 193, 195 (4th Cir. 1983)).  "Costs that result only indirectly from the offense, that are a step removed from the defendant's conduct, are too remote and are inappropriate for a restitution payment."  *Id.*

Although *Howell* did not use the phrase "proximate cause," the causation requirement described in *Howell* reflects "the long-accepted definition of proximate cause."  *Ford Motor Corp. v. Boomer*, 285 Va. 141, 150 (2013).  "The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred."  *Id.* (quoting *Wells v. Whitaker*, 207 Va. 616, 622 (1966)).

"Established principles of proximate causation are applicable in both civil and criminal cases."  *Brown v. Commonwealth*, 278 Va. 523, 529 (2009).  Accordingly, I would make explicit what *Howell* made implicit: the causation standard for determining the outer limit of criminal restitution is coextensive with the doctrine of proximate cause in tort law.

Although courts in some jurisdictions describe cause-in-fact as a separate requirement from "proximate cause," our Supreme Court considers it "a subset of proximate cause."  *Boomer*, 285 Va. at 150 n.2.  "The first step in determining factual causation 'is often described as the "but for" or *sine qua non* rule.'"  *AlBritton v. Commonwealth*, 299 Va. 392, 406 n.8 (2021) (quoting *Wells*, 207 Va. at 622).  In general, conduct "is a factual cause of harm when the harm would not have occurred absent the conduct."  *Boomer*, 285 Va. at 155 (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (2010)).  This cause-in-fact test

asks the counterfactual question whether the harm would not have occurred *but for* the tortious conduct.

The second step is determining whether a but-for cause is nevertheless so attenuated from the resulting harm that it fails to constitute the legal cause. *AlBritton*, 299 Va. at 406 n.8. This aspect of the proximate-cause inquiry has "been described as a shorthand descriptive phrase for the limits the law has placed upon an actor's responsibility for his conduct." *Id.* (quoting *Wells*, 207 Va. at 622).[11]

To be sure, courts have struggled to draw the line where "legal cause" or "proximate cause" limits the harms that would otherwise qualify for compensation under the but-for test. "It may readily be conceded that 'proximate cause' is an unsatisfactory phrase. It has not only troubled the unlearned, but has vexed the erudite." *Etheridge v. Norfolk S. R.R. Co.*, 143 Va. 789, 799 (1925) (citation omitted). But it is "too late" now—just as it was a century ago—"to discard" proximate cause. *Id.*

The proximate-cause analysis is also vexed by the respective roles of the judge and the jury (or, in a bench trial, the trial judge sitting as fact finder). Generally, causation and proximate cause are issues for the fact finder to decide. *Fox v. Deese*, 234 Va. 412, 427 (1987); *Hall v. Commonwealth*, 32 Va. App. 616, 632 (2000) (en banc). But "there are cases in which the state of the evidence is such that the absence of proximate cause is so apparent that the court is required [to so] hold as matter of law." *Scott v. Simms*, 188 Va. 808, 816 (1949). As the majority points out, however, there is "no yardstick," *id.*, that invariably identifies when the

---

[11] The majority errs in saying that "a loss or damage is not too remote if a defendant's offense is a 'but for' cause of the harm." *Supra* at 6. That misunderstands the function of the legal-cause element of proximate cause. There may be many but-for causes of an event that are nonetheless too attenuated to be the legal cause. Put another way, "Although all legal causes are factual causes, there can be factual causes that are not legal causes." *Chapman v. Commonwealth*, 68 Va. App. 131, 141 (2017).

court must decide the proximate-cause question as a matter of law, taking that decision away from the fact finder.

That problem maps onto criminal restitution cases as well. The trial judge, acting as the fact finder, must determine whether the harms for which restitution is sought were proximately caused by the defendant's offense. And appellate courts must give those judgments deference unless the causal relationship is so attenuated that no reasonable trial judge could determine that proximate cause has been established.

This Court's appellate deference to the trial court's proximate-cause determinations should also consider the difference between intentional misconduct and negligence. Assuming that the tortfeasor's conduct is the but-for cause of the victim's injury, the scope of the tortfeasor's liability is broader for intentional torts than for negligence. The Restatement (Second) of Torts explicitly recognized that distinction. *See* Restatement (Second) of Torts § 435B (1965). Broader liability for intentional torts turns on the idea "that responsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent . . . ." *Id.* cmt. a. In other words, the intentional tortfeasor may be required "to respond for compensatory damages in cases where, were he merely negligent, he would not be required to pay damages." *Id.*

The American Law Institute carried forward that principle in § 33(b) of the Restatement (Third) of Torts:

> An actor who intentionally or recklessly causes harm is subject to
> liability for a broader range of harms than the harms for which that
> actor would be liable if only acting negligently. In general, the
> important factors in determining the scope of liability are the moral
> culpability of the actor, as reflected in the reasons for and intent in
> committing the tortious acts, the seriousness of harm intended and
> threatened by those acts, and the degree to which the actor's
> conduct deviated from appropriate care.

Restatement (Third) of Torts, *supra*, § 33(b). *See also id.* cmt. b ("The Restatement Second of Torts §§ 435B and 501(2), which correspond to Subsection (b) of this Section, state the general principle that the moral culpability of an intentional or reckless tortfeasor is a relevant and important factor to take into account in determining the scope of liability.").

The two illustrations for that principle are helpful. Suppose the victim breaks up with his girlfriend while she is working as a bartender at a tavern. The bartender continues to pour drinks for him, "hop[ing] that his inebriation would lead to his being harmed." *Id.*, illus. 1. Driving home, the victim hits a telephone pole, suffering physical injuries. Suppose further that the jurisdiction in question "does not permit a common-law claim by a patron against a tavern keeper for negligently supplying alcohol to that patron while intoxicated, on the ground that the patron's drinking alcohol, not the serving of alcohol, is the proximate cause of harm." *Id.*[12] Under the expanded scope of liability for intentional torts, the defendant's "serving alcohol to [the victim] for the purpose of causing harm may be found by the factfinder to be within the scope of [the defendant's] liability." *Id.*

The second illustration involves a depression-sufferer who is injured by a blast from a bomb that the defendants have planted in a high-school parking lot, hoping to injure those in the vicinity. The explosion injures the already vulnerable victim, who commits suicide a year later. "Damages for [the victim's] death may be found by the factfinder to be within the scope of [the defendants'] liability for their intentional conduct," provided the fact finder concludes "that the injury from the bomb was a factual cause of [the victim's] suicide." *Id.*, illus. 2.

The Restatement (Third) explains that this "greater-scope-of-liability principle" in § 33(b) "is universally accepted and applied at the same high level of generality as is expressed

---

[12] Virginia is such a jurisdiction. *See Williamson v. Old Brogue, Inc.*, 232 Va. 350, 353 (1986).

in Subsection (b)." *Id.* cmt. e. While there appears to be no Virginia precedent recognizing this principle, it provides the appropriate rule of decision here, particularly since our Supreme Court has frequently followed the Restatement of Torts on commonly recognized doctrines like this one.[13]

Treating proximate-cause principles symmetrically in the criminal and civil contexts, the broader liability for intentional torts should likewise be coextensive with criminal-restitution awards for crimes involving intentional wrongdoing. Courts in Iowa and Massachusetts have expressly held that § 33(b) of the Restatement (Third) applies when judging the scope of liability for criminal restitution. *See State v. Roache*, 920 N.W.2d 93, 101-02 (Iowa 2018) ("The scope of liability is broader for intentional torts . . . . [W]e now hold that the Restatement (Third) of Torts' risk standard for scope of liability applies in criminal restitution determinations."); *Commonwealth v. Buckley*, 57 N.E.3d 1051, 1057-58 (Mass. App. Ct. 2016) (same). Their decision to do so is correct.

The majority misreads *Howell* to somehow restrict the scope of proximate cause applicable to criminal restitution. But other than not using the phrase "proximate cause," *Howell* provides no support for that conclusion. To the contrary, *Howell*, *Slusser*, and *Fleisher* all stand for the proposition that a crime that causes a victim to undertake improvements that make the victim better off than before are nonetheless not the *legal cause* of those expenditures, even if the victim would not have undertaken those improvements *but for* the crime. *See Howell*, 274 Va. at

---

[13] *E.g.*, *Doe v. Baker*, 299 Va. 628, 655 (2021); *Shoemaker v. Funkhouser*, 299 Va. 471, 481-82 (2021); *Padula-Wilson v. Landry*, 298 Va. 565, 576 (2020); *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 87 (2019); *A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 622-23 (2019); *Barr v. Atl. Coast Pipeline, LLC*, 295 Va. 522, 531 (2018); *Coward v. Wellmont Health Sys.*, 295 Va. 351, 360-61 (2018); *Palmer v. Atl. Coast Pipeline, LLC*, 293 Va. 573, 581-82 (2017); *see also Boomer*, 285 Va. at 154-58 (following Restatement (Third) of Torts in rejecting "substantial contributing factor" causation); *but see Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 424 n.4 (1988) ("Virginia law has not adopted § 402A of the Restatement (Second) of Torts and does not permit tort recovery on a strict-liability theory in products-liability cases.").

741 (denying restitution for a new security system when none was there before); *Slusser*, 74 Va. App. at 776 (distinguishing compensable repair costs that would restore the victim's burned-down home to its pre-crime status from non-compensable betterments like new appliances and upgraded fixtures); *Fleisher*, 69 Va. App. at 691 (affirming restitution for replacement of lock-and-key systems for the victim's two cars, not as "security upgrades," but to restore the victim "to the pre-crime status when she controlled access to her cars").  Those rulings also align with the purpose of compensatory damages: "to put an injured person in a position as nearly as possible equivalent to his position prior to the tort."  Restatement (Second) of Torts § 901 cmt. a (1979).

Neither the Supreme Court of Virginia nor this Court has applied a more limited version of proximate cause to criminal statutes compared to civil statutes.  The Supreme Court has described proximate-cause principles as "constant," whether "considered in a civil or criminal context."  *Robinson v. Commonwealth*, 274 Va. 45, 53 (2007) (quoting *Gallimore v. Commonwealth*, 246 Va. 441, 447 (1993)).

We too have applied proximate-cause standards from tort law symmetrically in criminal cases.  *See Levenson v. Commonwealth*, 68 Va. App. 255, 259 (2017); *Chapman v. Commonwealth*, 68 Va. App. 131, 140-41 (2017); *Hawkins v. Commonwealth*, 64 Va. App. 650, 655 (2015).  The criminal statutes at issue in those cases had wording that, like the restitution statutes here, failed to warrant any departure from standard proximate-cause analysis.  *Robinson* found proximate-cause principles implicit in the phrase "involved in an accident" in Code § 46.2-894.  274 Va. at 53-54.  *Levenson* applied standard proximate-cause analysis to Code § 18.2-36.1(A), which looks to whether the unintentional death of another occurred "as a result of" the defendant's driving under the influence.  68 Va. App. at 259.  And *Hawkins* applied standard proximate-cause analysis to malicious wounding under Code § 18.2-51.2, which

- 27 -

criminalizes conduct that "causes bodily injury." 64 Va. App. at 654-55. We found standard proximate-cause principles applicable even in *Chapman*, despite that the statute there, Code § 46.2-868(B), required that the victim's death be "the sole and proximate result" of the defendant's reckless driving. 68 Va. App. at 140-45.

If normal proximate-cause principles were warranted by the statutes in those cases, why not by the language of the statutes that permit restitution for "damages or loss caused by" the offense? Code §§ 19.2-303, 19.2-305(B), 19.2-305.1(B). I see no principled basis to treat the causation standard for criminal restitution differently from the causation standard in other criminal contexts.

III.

Applying standard proximate-cause principles here, I conclude that Tyler's embezzlement was the but-for cause of those damages for which the Court has upheld the trial court's restitution award. I further agree that those damages were not so attenuated or indirect as to not have been proximately caused by Tyler's misconduct.

I also agree with the majority that the trial court erred in awarding restitution for the law firm's costs of defending itself in the VSB disciplinary proceeding and its costs to comply with the VSB's future-auditing requirement. But I disagree with the majority's rationale.

The majority mistakenly concludes, *supra* at 15-17, that Tyler's embezzlement was not the but-for cause of the costs of defending the VSB proceeding nor of the VSB-auditing requirement. The majority reasons that, "Because the firm could have been sanctioned regardless of Tyler's embezzlement, her crime was not a 'but for' cause of the VSB fees." *Supra* at 17. As the Commonwealth correctly points out, however, "If Tyler had not stolen the firm's funds, a bar complaint would not have been filed with the VSB," and there likely would not have been a disciplinary proceeding that resulted in a reprimand and imposed a future "auditing

- 28 -

requirement." The majority fails to explain why the Commonwealth is wrong about that. If the majority's position depends on the assumption that there can only be one proximate cause of an event, that is incorrect. *See, e.g.*, *Rich v. Commonwealth*, 292 Va. 791, 800 (2016) ("Because an event can have more than one proximate cause, criminal liability can attach to each actor whose conduct is a proximate cause unless the causal chain is broken by a superseding act that becomes the sole cause of the [event]." (quoting *Brown*, 278 Va. at 529)).

I do not underestimate the difficulty of determining whether the VSB costs are so attenuated that Tyler's embezzlement could not be said to be the legal cause of that injury. I see three possible answers and conclude that the third one is correct.

One answer—rejecting Tyler's liability—might be based on the Restatement's exception to the expanded scope of liability for intentional wrongdoing when the risk of harm "was not increased by the actor's intentional or reckless conduct." Restatement (Third), *supra*, § 33(c). Under § 33(c), "intentional and reckless tortfeasors are not liable for harms whose risks were not increased by the tortious conduct, even if that conduct was a factual cause of the harm." *Id.*, cmt. f. Illustration No. 3 is informative. Suppose two defendants attempt to assault a victim and the victim, running away, is "struck by lightning," suffering "serious burns." *Id.*, illus. 3. The defendants, "despite their assault on [the victim], are not liable for his harm because their assault, while a factual cause of [the victim's] burns, did not increase the risk of being struck by lightning and suffering burns." *Id.*

Are the law firm's costs of defending the VSB proceeding and its future VSB-auditing costs like the burns caused by the lightning strike? I think not. In Illustration 3, the defendants' misconduct did not increase the risk that the victim would be struck by lightning. In this case, by contrast, Tyler's embezzlement surely increased the risk that the law firm would be disciplined by the VSB for its lack of internal controls. That lack of controls continued, undiscovered, for

eight years or more until Tyler's scheme unraveled and came to light.  So the exception in § 33(c) is inapplicable.

The second possible answer is that the VSB costs were proximately caused by Tyler's embezzlement, consistent with the expanded scope of liability for intentional wrongdoing under § 33(b).  True, the law firm's own carelessness and lack of internal controls enabled Tyler to exploit its vulnerability, stealing from the law firm and its clients for years.  A sentencing judge could certainly deny restitution on that ground.  But awarding compensation would also be consistent with the "familiar principle that contributory negligence is not a defense to an intentional tort." *Williams v. Harrison*, 255 Va. 272, 275 (1998) (citing Restatement (Second) of Torts § 481 (1965)).  That principle is necessary to provide fair compensation to victims whose lack of care has made them particularly vulnerable to criminal exploitation.  Just as a tortfeasor takes the plaintiff as he finds him under the "egg-shell-skull doctrine," *Carrington v. Aquatic Co.*, 297 Va. 520, 527 & n.3 (2019), a criminal defendant "cannot raise the victim's comparative fault as a defense" to restitution, *Roache*, 920 N.W.2d at 103.  The wrongdoer may be held "criminally responsible for *all* the legal consequences of his crime, irrespective of the lack of care of his victim."  Restatement (Second) of Torts § 918 cmt. a (1979) (emphasis added).

There is yet a third possible answer—the correct one, I think.  When assessing legal cause, a victim's illegal conduct or violation of positive law is materially different from a victim's mere carelessness.  The Supreme Court of Virginia has repeatedly applied the *ex turpi causa* doctrine originally set forth by Lord Mansfield in *Holman v. Johnson*, 1 Cowp. 341, 98 Eng. Rep. 1120 (K.B. 1775):

> No Court will lend its aid to a man who founds his cause of action
> upon an immoral or an illegal act.  If . . . the cause of action
> appears to arise ex turpi causa, or the transgression of a positive
> law of this country, . . . he has no right to be assisted.

*Id.* at 343, 98 Eng. Rep. at 1121; *see Miller v. Bennett*, 190 Va. 162, 165 (1949); *Maughs v. Porter*, 157 Va. 415, 422 (1931); *S. Ry. Co. v. Rice's Adm'x*, 115 Va. 235, 245 (1913); *Roller v. Murray*, 112 Va. 780, 783-84 (1911). "The rule applies to both tort and contract actions, and when applied to tort actions, 'consent or participation in an immoral or unlawful act by plaintiff precludes recovery for injuries sustained as a result of that act.'" *Wackwitz v. Roy*, 244 Va. 60, 64 (1992) (quoting *Miller*, 190 Va. at 165). So when a claimant "seeks monetary reward for harm resulting from the unlawful conduct, the public interest is protected sufficiently by criminal sanctions and does not require that the participant receive compensation." *Zysk v. Zysk*, 239 Va. 32, 34-35 (1990), *overruled on other grounds*, *Martin v. Ziherl*, 269 Va. 35, 43 (2005).

While the law firm would not have incurred the VSB costs but for Tyler's embezzlement, those costs were also caused by its own violation of the Virginia Rules of Professional Conduct: Rule 1.15, governing the safekeeping of client property, and Rule 5.3, governing its obligations to supervise nonlawyer assistants like Tyler. The Virginia State Bar determined in an agreed disposition that those rules imposed mandatory legal obligations on the law firm, the breach of which subjected it to professional discipline in the form of a public reprimand and a two-year auditing requirement.[14] Because the law firm's "transgression of a positive law," *Miller*, 190 Va. at 165 (quoting *Holman*, 1 Cowp. at 343, 98 Eng. Rep. at 1121), thus "contributed directly and proximately to cause" its injury, *S. Ry. Co.*, 115 Va. at 246 (citation omitted), the law firm should not have been compensated for that loss.

---

[14] Although neither party mentioned the *ex turpi causa* doctrine, their respective reliance on the law firm's violations of the Virginia Rules of Professional Conduct suffices to put the issue before the Court. Both Tyler and the Commonwealth characterize the VSB costs as arising out of the law firm's ethical violations: Tyler says that the law firm was "sanctioned" for its managing partner's "own violations of various ethical rules," Tyler Br. 6; and the Commonwealth cites the law firm's "misconduct" in violating Rules 1.15 and 5.3 but says that the violation "directly relates to Tyler's embezzlement," Commonwealth Br. 16.

Because the *ex turpi causa* doctrine best explains why the law firm's violation of its professional duties, not Tyler's embezzlement, is the legal cause of the VSB costs, I concur in the judgment denying restitution for those costs.